## ETHERIDGE *v.* SPERRY.

ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

No. 186. Submitted March 2, 1891. — Decided March 23, 1891.

*Buck* v. *Colbath*, 3 Wall. 334, affirmed on the point that a suit prosecuted in the state courts to the highest court of such State against a marshal of the United States for trespass, who defends himself on the ground that the acts complained of were performed by him under a writ of attachment from the proper federal court, presents a case for a writ of error to this court, when the final decision of that court is against the validity of the authority thus set up by the marshal.

Following the Supreme Court of Iowa in its construction of the local law of that State this court holds that a mortgage of a stock of goods in a

store in that State, otherwise valid, is not invalidated by reason of a parol understanding at the time of its execution, that the mortgagor may retain possession, and sell the goods, and apply the proceeds to his own support, and to keep up the stock, applying only the surplus to the payment of the mortgage debt.

There is so much of a local nature entering into chattel mortgages that this court will accept the settled law of each State as decisive in respect to any case arising therein.

The case is stated in the opinion.

*Mr. F. W. Lehmann* and *Mr. N. W. Bliss* for plaintiff in error.

*Mr. Henry S. Wilcox* for defendants in error.

Mr. Justice Brewer delivered the opinion of the court.

The plaintiff in error was deputy United States marshal for the Southern District of Iowa. Into his hands was placed a writ of attachment, issued out of the Circuit Court of the United States for that district, in the case of *Marshall, Field & Co.* v. *George W. Hamilton.* Under that writ he levied upon the major portion of a stock of goods in the possession of the defendant Hamilton, the owner of a country store in the town of Knoxville, Iowa. The goods thus levied upon were subsequently sold by order of the court. The defendants in error were creditors of George W. Hamilton, secured by two chattel mortgages on the goods levied upon. After demand they commenced their action in the state court to recover so much of the value of the goods levied upon by the plaintiff in error as would satisfy their debts, with interest. The trial in that court resulted in a judgment in their favor. The judgment was affirmed by the Supreme Court of the State, and from such judgment of affirmance the case comes here on error. As to the jurisdiction of this court, see *Buck* v. *Colbath,* 3 Wall. 334.

It appears that the value of the goods taken on the attachment was considerably in excess of the amount of the mortgage debts; so that if these mortgagees were entitled to recover

anything, they were entitled to recover the full amount of their debts. It also appears that Hamilton had no property in the State of Iowa, subject to execution, other than this stock of goods; and that the portion of the stock not taken on the attachment was appropriated in satisfaction of a prior mortgage. These mortgagees had no other security. The case, therefore, narrows itself to the question whether these chattel mortgages were valid. They were executed respectively July 4 and July 5, 1882, and were filed for record on those days. The first (and the two were similar) was in the usual form of chattel mortgages, and, for the consideration of $346.62, conveyed to plaintiffs "all my stock of dry goods and groceries, notions, boots and shoes, book accounts, notes and merchandise of every description, now in my store in Knoxville, Marion County, Iowa, and to include all goods and merchandise which may hereafter be brought into said store," with the usual warranty of title, and to be void on condition that Hamilton should pay the plaintiffs three notes, dated July 4, 1882; one for $100, due September 4, 1882; one for $100, due October 4, 1882; and one for $104.62, due November 4, 1882, with interest. The mortgage further stipulated: "And I, the said George W. Hamilton, do hereby covenant and agree to and with the said Sperry, Watt & Garver that, in case of default made in the payment of the above promissory notes, or in case of my attempting to dispose of or remove from said county of Marion, the aforesaid goods and chattels, or any part thereof, or whenever the said mortgagee or his assigns shall choose so to do, then and in that case it shall be lawful for the said mortgagee or his assigns, by himself or agent, to take immediate possession of said goods or chattels wherever found." Then followed the usual power of sale, a provision for attorney's fees in case the mortgage should be foreclosed by suit, and that if anything remained after paying plaintiffs' claim it should be returned to Hamilton. The other mortgage, executed the next day, was for $89.54, as evidenced by a promissory note for that amount, dated July 5 and due July 28, 1882, with interest. These claims of the mortgagees were for goods sold during the six months prior to the execu-

tion of the mortgages. It appears that in the fore part of that year Hamilton had had a partner named Douglas, and the first mortgage was for goods bought by that firm; and the second for goods bought by Hamilton alone, after he had purchased Douglas's interest in the partnership. It is contended that these mortgages should be considered as executed simultaneously, and parts of one transaction, and as equivalent to a general assignment for the benefit of creditors, and that, having preferences in them, they are void under the state law respecting assignments. But this contention is clearly untenable. The instruments, on their faces, are mortgages given to secure debts not yet due. The mortgagor had no thought of closing out his business. He expected to continue in it, and hoped out of the profits thereof to pay this indebtedness coming due in the future. He had, on June 26, given a prior mortgage to secure another creditor; and on July 6, the day after the execution of the last mortgage in controversy, when another creditor demanded security, he declined to give it without including in the mortgage all his other creditors, and did execute such a mortgage. So that if we could ignore the form of the several instruments, the only one which by any pretence could be called an assignment for the benefit of creditors was the one executed on the 6th day of July, an instrument not contemplated at the time these mortgages were given, and one forced upon him by the subsequent demands of another creditor. Obviously these instruments were, in the intent of the parties, what upon their face they appear to be, simply conveyances for security — chattel mortgages.

The other contention is, that the court erred in refusing to give this instruction:

" 1. If the jury find from the evidence that the mortgagor in the chattel mortgages in evidence in this case was left in possession of the stock of goods mortgaged, with no provision for the application of the entire proceed of sales to the payment of debts secured by the mortgages, but with the privilege, express or implied, of continuing the business of buying and selling as before the making of the mortgages and applying a portion of the proceeds of sale to his own use, then

such mortgages are fraudulent and void in law as to creditors."

In its charge the court thus stated the question:

"The issue submitted to you is this: Were the mortgages of plaintiffs executed in good faith and for the purposes of securing a *bona fide* indebtedness due to them from George W. Hamilton at the time, or were the same executed by Hamilton and received by the plaintiffs for the purpose of defrauding creditors of George W. Hamilton."

It further instructed the jury that the insolvency of Hamilton, if proved, would not of itself avoid the mortgages; and that he had the right to prefer any of his creditors. And upon the question of fraud it gave this instruction:

"In determining the question of fraud in the execution of mortgages you should take into consideration all the evidence that has been introduced bearing upon that question. Fraud is never presumed, but must be proved by the party alleging the same, and in determining whether or not there was fraud in any transaction you should consider all the circumstances of the case, and while the debtor retaining possession or the fact of the insolvency of the mortgagor do not, as a matter of law, determine the transaction to be fraudulent, yet in determining the question of fact you may consider the insolvency of the mortgagor, if he was insolvent, the fact of his retaining possession of the goods mortgaged, if he did so retain them, and what agreement, if any, was made between the parties with reference to the disposition that should be made of the goods so in his possession; and from all the evidence and circumstances in the case you will determine whether the transactions between the plaintiffs and Hamilton were in good faith, or whether they were designed and intended by the parties to defraud the other creditors of Hamilton."

On the face of the instruments there is clearly no foundation for the instruction which was refused. There is no reservation of interest to the mortgagor. On the contrary, the express provision is that if he defaults in payment, if he attempts to dispose of or remove from the county the mortgaged property, or any part of it, and whenever the mortgagee

shall see fit, the latter may take immediate possession. While from the fact that the property mortgaged is a stock of goods in a store, possession of which is left with the mortgagor, there may be an implication that sales at retail by him were contemplated; yet express authority is given to the mortgagee to take possession at the first sale, and before the maturity of any one of the secured notes. So that upon the face of the mortgages there is nothing to suggest or justify the instruction. The mortgagor was put upon the stand as a witness for the plaintiffs in error, and testified as follows: "At the time I executed the first mortgage to Sperry, Watt & Garver it was understood between Mr. Ayers" (he being the attorney of the mortgagees) "and me that I was to go on selling goods in the ordinary way, and that I would be able to pay out. I was to use the money received from the sale of goods and use some of the money to buy goods, and I was to pay out of the proceeds the running expenses of the establishment and to take out whatever was needed for the support of myself and family, and to use the money in buying goods as I saw proper in carrying on the business, filling up the stock, and all that, and the money deposited in the bank that I did not need for the other purpose was to be applied on the payment of the debt." This testimony was repeated by him in different words, but disclosing no additional facts; and it is upon this statement of the understanding between him and the attorney of the mortgagees that this instruction was based. He did not in fact use any of the proceeds of the sales made by him for his own support, although his possession was not disturbed by the attachment until after the 13th of August, 1882, but used the entire proceeds in buying some additional goods for the store and in paying his debts. Perhaps this is only material on the question of good faith, and does not detract from the damaging effect, if any there be, of the understanding between the parties at the time of the execution of the mortgage. So the question is presented, whether, as a matter of law, a mortgage given by a merchant on his stock of goods to secure debts not yet due, which upon its face has no imperfections, contains no reservations for the benefit of the mortgagor, and is appar-

ently only for the security of the mortgagee, and gives him full power to take possession on default in payment, or on any misconduct of the mortgagor, or whenever he pleases, is in validated by the fact of a parol understanding, at the time of its execution, that the mortgagor may use the proceeds of his daily sales to support himself, and to keep up the stock by purchases, applying only the surplus, but all of that, to the payment of the mortgage debt; or whether such an under-standing is simply to be taken into consideration, together with the other circumstances, as bearing upon the question of the good faith of the parties. The contention of the plaintiff in error is in support of the first alternative of this question, and he relies mainly on the cases of *Bank of Leavenworth* v. *Hunt*, 11 Wall. 391; *Robinson* v. *Elliott*, 22 Wall. 513, and *Means* v. *Dowd*, 128 U. S. 273. While there are some points of similarity between each of those cases and this, and while there are observations in the opinions filed in them pertinent and correct with reference to the special facts which, if dis-connected from those facts and applied here, might seem authoritative, yet there are clear and sufficient reasons why neither the decisions nor the opinions should control this case. In *Bank of Leavenworth* v. *Hunt*, the validity of a chattel mortgage was in question. But it had not been filed in the office of the register of deeds, as required by the statutes of Kansas, and under those statutes was, therefore, void as against creditors. It was said in the opinion that it was void for an-other reason, and that was, that the mortgagors were permitted to remain in possession and to continue to sell the goods as before the mortgage. But as appears from the statement of facts, these sales were not made with a view of appropriating the surplus proceeds to the payment of the mortgage debt, but for the sole benefit of the mortgagors.

In *Robinson* v. *Elliott*, a case coming from Indiana, the objection to the chattel mortgage appeared on the face of the instrument, in that it permitted the mortgagor not only to retain possession, but to sell and buy as theretofore, with no stipulation for the application of the surplus proceeds to the payment of the mortgage debt, the only stipulation being that

the purchased goods should come within the lien of the mort-
gage. Apparently this retained power of sale by the mort-
gagor was in no respect for the benefit of the mortgagee, but
to enable the mortgagor to continue in business in defiance of
his unsecured creditors, protected by the lien of this mortgage.
The conduct of the parties after the mortgage was in harmony
with this apparent intent, and removed any uncertainty as to
the scope and purpose of the instrument. It was not intended
by that decision to hold that a chattel mortgage was void
because it provided for a retention of possession by the mort-
gagor, and a sale by him. On the contrary, Mr. Justice Davis,
delivering the opinion of the court, carefully used this lan-
guage: " We are not prepared to say that a mortgage under
the Indiana statute would not be sustained which allows a
stock of goods to be retained by the mortgagor, and sold by
him at retail for the express purpose of applying the proceeds
to the payment of the mortgage debt. Indeed, it would seem
that such an arrangement, if honestly carried out, would be
for the mutual advantage of the mortgagee and the unpre-
ferred creditors. But there are features engrafted on this
mortgage which are not only to the prejudice of creditors, but
which show that other considerations than the security of the
mortgagees, or their accommodation even, entered into the
contract. Both the possession and right of disposition remain
with the mortgagors. They are to deal with the property as
their own, sell at retail, and use the money thus obtained to
replenish their stock. There is no covenant to account with
the mortgagees, nor any recognition that the property is sold
for their benefit."

The instrument considered in *Means* v. *Dowd* was regarded
by this court more in the nature of an assignment for the
benefit of creditors than as a chattel mortgage ; and the same
elements were discovered in that instrument, and in the sub-
sequent conduct of the parties, as appeared in the case in 22
Wall. In neither of those cases is it affirmed that a chattel
mortgage on a stock of goods is necessarily invalidated by the
fact that either in the mortgage, or by parol agreement be-
tween the parties, the mortgagor is to retain possession, with

the right to sell the goods at retail. On the contrary, it is clearly recognized in them that such an instrument is valid, notwithstanding these stipulations, if it appears that the sales were to be for the benefit of the mortgagee. What was meant was, that such an instrument should not be used to enable the mortgagor to continue in business as theretofore, with full control of the property and business, and appropriating to himself the benefits thereof, and all the while holding the instrument as a shield against the attacks of unsecured creditors. Neither was it suggested in either of those cases that this court, in determining the validity of a chattel mortgage, would ignore the settled law of the State in which the transaction took place, as established by the decisions of its highest court. On the contrary, there was an intimation that this court would respect such decisions. In the opinion in *Robinson* v. *Elliott*, this court said there had been no decision of the question by the Supreme Court of the State, — though as to the present state of the law see *Morris* v. *Stern*, 80 Indiana, 227; *McFadden* v. *Fritz*, 90 Indiana, 590; *Fisher* v. *Syfers*, 109 Indiana, 514; *Muncie National Bank* v. *Brown*, 112 Indiana, 474; *New* v. *Sailors*, 114 Indiana, 407, and *Mayer* v. *Feig*, 114 Indiana, 577, — but noticed some intimations and citations in one of its opinions which it was thought tended to support the conclusion reached. And the opinion in *Means* v. *Dowd*, not only noticed this intimation in the former case, but expressly referred to the law as established in North Carolina, that being the State in which the transaction took place. Further, in the case of *People's Savings Bank* v. *Bates*, 120 U. S. 556, 561, a case coming from the State of Michigan, and involving the question of the validity of a chattel mortgage, Mr. Justice Harlan, delivering the opinion of the court, referred to the law of the State as controlling. He said : " In behalf of the bank it is contended that the mortgage to Bates, Reed, & Cooley was fraudulent as against subsequent creditors and mortgagees in good faith, in that the mortgagees contemplated that the mortgagors should remain in possession and prosecute the business in the ordinary mode. . . . If the mortgage had, in terms, made provision for such a course upon the part

of the mortgagors, as the bank contends was in the contemplation of the mortgagees, it would not be held, as a matter of law, to be absolutely void or fraudulent as to other creditors. *Oliver* v. *Eaton*, 7 Michigan, 108, 112; *Gay* v. *Bidwell*, 7 Michigan, 519, 523; *People* v. *Bristol*, 35 Michigan, 28, 32; *Wingler* v. *Sibley*, 35 Michigan, 231; *Robinson* v. *Elliott*, 22 Wall. 513, 523. The good faith of such transactions, where they are not void upon their face, is, under the statutes of Michigan, a question of fact for the determination of the jury. *Oliver* v. *Eaton* and *Gay* v. *Bidwell*." See also *Allen* v. *Massey*, 17 Wall. 351. While in the foregoing quotation reference is made only to the statutes of the State, the law is as fully established by repeated decisions of its Supreme Court as by the express language of its statutes. This decision not only gives countenance to the ruling of the trial court in this case, but also warrants an examination of the settled law of the State, as evidenced by the decisions of its highest court. In respect to the latter there can be no doubt. Independently of the ruling in this case, see *Torbert* v. *Hayden*, 11 Iowa, 435; *Hughes* v. *Cory*, 20 Iowa, 399; *Meyer* v. *Gage*, 65 Iowa, 606; and *Meyer* v. *Evans*, 66 Iowa, 179. In the first of those cases, it appeared that the mortgagors, with the knowledge of the mortgagee, remained in possession, and sold in the ordinary course of business about a thousand dollars' worth of goods, the proceeds of which were applied to their support and the rent and expenses of the store; and the transaction, having been found to have been in good faith, was sustained, and the mortgage adjudged valid. This decision was in 1861.

In the second case, decided in 1866, the mortgage on its face reserved the right to sell, in the usual course of business, and to add to the stock by the purchase of other goods, with the stipulation that thirty-three per cent of the sale should be applied on the mortgage debt; and in an elaborate opinion by Judge Dillon, the mortgage was sustained.

In the third case, decided in 1885, there was simply a reservation of possession, with the right to sell at retail, and in respect thereto the court summed up the law of the State in these words: "And the uniform holding of this court has

been that the reservation by the mortgagor of the right to retain possession of the property, and sell it in the ordinary course of business, does not render the mortgage fraudulent in law. See *Torbert* v. *Hayden*, 11 Iowa, 435; *Hughes* v. *Cory*, 20 Iowa, 399; *Clark* v. *Hyman*, 55 Iowa, 14; *Sperry* v. *Etheridge*, 63 Iowa, 543; *Jaffray* v. *Greenbaum*, 64 Iowa, 492. This holding is based upon the construction given to certain statutes of the State, and it has been adhered to for more than twenty years, and has become a rule of property in the State, and we see no occasion now for departing from the rule that has been thus established."

And in the last case, by the terms of the instrument, there was reserved a right to sell at retail, in the ordinary course of trade; and there was, besides, a parol understanding that the mortgagor should keep up the stock and pay the expenses out of the proceeds of the business; and there was no provision in the mortgage, and no agreement, that the surplus proceeds should be applied on the debt, but by the terms of the mortgage the mortgagee had the right at any time to take possession of the property, and sell the same for the satisfaction of his debt. And it was held that the mortgage was not invalidated thereby, but that its validity depended on the good faith of the parties to the transaction.

From these decisions and others running through a period of thirty years, there can be no doubt as to the settled law of the State; and as to the law established, as was said by the Supreme Court, in *Meyer* v. *Gage, supra,* mainly at least from a construction of the state statutes. Can such a settled construction be ignored by this court, and the judgment of the highest court of the State be reversed on error in a matter depending partially at least upon the construction of state statutes? It would be strange, indeed, if this court should adjudge that there was error on the part of the Supreme Court of a State in following its own rulings, uniform and undisturbed for a quarter of a century. The matter is not one of purely general commercial law. While chattel mortgages are instruments of general use, each State has a right to determine for itself under what circumstances they may be executed,

the extent of the rights conferred thereby, and the conditions of their validity. They are instruments for the transfer of property, and the rules concerning the transfer of property are primarily, at least, a matter of state regulation. We are aware that there is great diversity in the rulings on this question by the courts of the several States; but whatever may be our individual views as to what the law ought to be in respect thereto, there is so much of a local nature entering into chattel mortgages that this court will accept the settled law of each State as decisive in respect to any case arising therein. *Chicago Union Bank* v. *Kansas City Bank*, 136 U. S. 223. Indeed, if this were an open question, we could not be blind to the fact that the tendency of this commercial age is towards increased facilities in the transfer of property, and to uphold such transfers so far as they are made in good faith; and it is at least worthy of thought, whether the rulings made by the Supreme Court of Iowa do not tend to make chattel mortgages more valuable for commercial purposes, without endangering the rights of unsecured creditors. The law now generally requires a record of all such instruments, and that, like the recording of a real estate mortgage, gives notice to all parties interested of the fact and extent of incumbrances. Why should a transaction like this be condemned, if made in good faith and to secure an honest debt? The owner of a stock of goods may make an absolute sale of them to his creditor, in payment of a debt. If an absolute, why not a conditional, sale, with such conditions as he and his creditor may agree upon? As between the parties no court would question this right, or refuse to enforce the conditions. The interests of the general public are not prejudiced by any such transaction between debtor and creditor. Indeed, they are rather promoted by any arrangement under which the mortgagor can continue in business, for in ninety-nine cases out of a hundred the taking of possession by a creditor results in closing the business, and turning the debtor out of employment. The only parties who can claim to be injuriously affected are unsecured creditors. But they are notified by the record of the exact relations between the mortgagor and mortgagee;

and surely subsequent creditors have no right to complain if they deal with the mortgagor with full knowledge of such relations. Existing creditors may of course challenge the good faith of the transaction, but if they cannot disturb an absolute sale when made in good faith, why should they be permitted to challenge a conditional sale if made in like good faith? The fact that fraudulent relations are possible, is hardly a sufficient reason for denouncing transactions which are not fraudulent. So, if the question were open, or a new one, unaffected by any settled law of the State, we incline to the opinion that the question is not one of law, so much as it is one of fact and good faith, and that the decision of the Supreme Court of Iowa rests on sound principles. *Jewell* v. *Knight*, 123 U. S. 426; *Smith* v. *Craft*, 123 U. S. 436. Reference may also be made to the opinion of Mr. Justice Bradley, of this court, holding the Circuit Court in the Western District of Texas, *Barron* v. *Morris*, 14 Nat. Bank. Reg. 371, and the opinion of Mr. Justice Strong in the Circuit Court in New Jersey, in *Miller* v. *Jones*, 15 Nat. Bank. Reg. 150.

We see no error in the decision of the Supreme Court of Iowa, and it is                                   *Affirmed.*