NOYES ET AL., APPELLANTS, *v.* ROSS ET AL., RESPONDENTS.

[No, 1,158.]

[Submitted October 18, 1899.  Decided December 18, 1899.]

*Chattel Mortgages — Fraud — Possession — Relationship of Parties—Trial —Findings—Evidence—Partnership Property—Assignment—Intention—Title—Liens.*

1. Defendants, after contracting a debt to plaintiffs, executed a chattel mortgage to a third party on all their property. consisting of a stock of goods, the consideration for which was a previous loan, with which the mortgagors had purchased part of the goods. A further consideration were certain debts assumed by the mortgagee. The value of the goods was only a reasonable security for this combined debt. The mortgagors were to remain in possession, and sell at retail in the usual way of business for cash, or on not to exceed 30 days' credit, and to account to the mortgagee for the proceeds of the sales, and one of them was to be allowed to retain living expenses from the proceeds. The balance, after deduction of costs, was to go to the mortgagee. The mortgagee, in fear of losing the security, made a sale of the property by public auction prior to the maturity of the debt. *Held,* that the transactions were not in fraud of creditors.

2. A chattel mortgage otherwise valid is not fraudulent because of relationship between the mortgagee and one of the mortgagors.

3. The principle that the assets of a partnership are for distribution to their creditors does not obtain without regard to rights already existing.

4. The right to have partnership property first applied to partnership debts is one primarily for the benefit of the partners, and if they waive such right, firm creditors cannot invoke it to secure preferences over mortgage creditors.

5. The fact that a chattel mortgagor in possession is allowed to draw $100 per month from the proceeds of sales, is not of itself conclusive of fraud.

6. Where the trial court found the issues generally in favor of defendant, and there was evidence to justify the finding, it will not be disturbed on appeal.

7. Where defendants gave a mortgage on all their property, which consisted of a stock of goods, they retaining possession and intending to continue the business, and having given the mortgage as a lien only, without intention to convey title or right to immediate possession, such mortgage will not operate as an assignment in favor of the mortgagee as a creditor.

8. A chattel mortgage which authorizes the mortgagor to retain possession, with the right to sell the stock of goods mortgaged in the ordinary and usual course of trade, if otherwise good, is valid, provided it appears therein that such sales are to be for the benefit of the mortgagee, and the mortgagor is to account to the mortgagee for the proceeds of the sales.

9. The question of the good faith of a chattel mortgage transaction is not to be decided as one entirely of law, but is largely one of fact.

10. A chattel mortgage is not on its face invalid because it authorizes one of the mortgagors in possession to retain his actual and necessary living expenses out of the proceeds of the mortgaged personalty.

11. A provision in a chattel mortgage giving authority to a mortgagor in possession "to sell at retail to regular and other customers in the usual and general way of business for cash, or on not to exceed 30 days' credit to responsible parties," does not, *per se*, render the mortgage void,—where the mortgage provides for accurate accounts of all sales, and that collections and deposits be applied towards the payment of the debt, less necessary and actual expenses of conducting the business.

12. An unauthorized sale of mortgaged property by the mortgagee before maturity of the mortgage debt, the mortgage being valid, and the mortgagor acquiescing in the sale, is not invalid as to creditors who had no lien on the property.

*Appeal from District Court, Yellowstone County; George R. Millburn, Judge.*

Action by Daniel R. Noyes and others against A. E. Ross and another. From a judgment in favor of defendants, plaintiffs appeal. Affirmed.

## Statement of the Case.

The plaintiffs, Daniel R. Noyes et al., brought this action against A. E. Ross and A. A. Fenske, co-partners under the firm name of A. E. Ross & Co., and L. H. Fenske, defendants, in aid of supplemental proceedings to have declared void a chattel mortgage executed and delivered by A. E. Ross and A. A. Fenske, under the firm name of A. E. Ross & Co., to L. H. Fenske, and to have the said L. H. Fenske account to the plaintiffs for certain property of the said firm of Ross & Co. alleged to have come into his hands under the said mortgage.

It is alleged in the complaint that on July 9, 1895, plaintiffs obtained a judgment against the said defendants A. E. Ross and A. A. Fenske, partners as aforesaid, for the sum of $1,985.45, together with interest; that execution was issued on said judgment on July 10, 1895, but that the same was returned unsatisfied; that thereafter, in November, 1895, proceedings were had supplementary to execution, and an order made on November 18, 1895, authorizing plaintiffs to bring an action against the defendants herein to determine the validity of the mortgage heretofore referred to; that the defendants, Ross & Co., prior to February 16, 1895, and subsequent to the contracting of the indebtedness upon which the judgment of the plaintiffs was recovered, owned a certain stock of drugs and fixtures, contained in their drug store, in the city of Billings, and that the said stock and fixtures were then of the value of about $7,000. It is further averred that on February 16, 1895, the firm of Ross & Co. fraudulently, and for the purpose of hindering, delaying, and defrauding their creditors, made and delivered, or pretended to make and deliver, to the defendant, L. H. Fenske, a certain chattel mortgage, covering all of the stock of drugs, etc., in the said store of the said firm; but that the said chattel mortgage was without any valuable consideration and was fraudulent and void, and made with the intent to hinder, delay, and defraud creditors of said firm, and especially these plaintiffs; and that the said defendant, L. H. Fenske, for the sole purpose of helping the said firm and the partners thereof in their scheme to hinder, delay, and defraud the creditors of the firm, took the property described in the mortgage at the said time and at all times since, and still does claim and pretend to be the holder thereof by virtue of said chattel mortgage.

The mortgage contains the usual formal recitals included in chattel mortgages under the laws of Montana, and, in addition thereto, covers all the shelving, show cases, drugs, medicines, wines, liquors, etc., contained in the drug store of the plaintiffs, and is broad enough in its terms to cover all the goods and chattels used in connection with the said drug business,

and all stocks that might have been subsequently put into the said store to keep up the said business. The mortgage was given to secure the payment of a promissory note for $4,500, dated at Billings, February 16, 1895, and due on or before one year after date, by A. E. Ross and A. A. Fenske to L. H. Fenske. It was provided in the mortgage that, in case default was made in the payment of the principal or interest, the mortgagee or the sheriff was empowered to sell the goods and chattels as prescribed by the terms of the mortgage, and out of the money arising from such sale to retain the principal and interest, and the overplus, if any there should be, was to be paid on demand to the said parties of the first part, that is, the firm of Ross & Co. It was also provided that, in case the power of sale should be executed, such sale should be advertised for five days, and might be either public or private. Furthermore, the mortgage permitted the mortgagors to remain in possession of the property, and to sell the goods described in the mortgage, until default; but provided that if, prior to the maturity of the indebtedness of the firm, the property, or any part thereof, was attached or claimed by any other person, or if at any time the mortgagee should consider the possession of said property, or any part thereof, essential to the security of the payment of the mortgagor's note or to the preservation of said property, then the mortgagee or the sheriff should have the right to immediately take possession of the said property, and the whole or any part thereof, and should have the right, at his option, to take possession from any person having or claiming the same, with or without suit or process, and for that purpose might enter upon the premises where the property might be found. The mortgage also included the following provisions:

"It is further expressly provided and agreed by and between the parties to this mortgage that the parties of the first part (Ross & Co.) may, and they are hereby authorized to, sell from said stock of drugs and goods, wares and merchandise, and from other goods hereafter added thereto, at retail, to the regular and other customers in the usual and general

way of business, for cash, or on not to exceed thirty days' credit to responsible parties; but the parties of the first part shall keep accurate account of all such sales, and during banking hours of each day deposit the proceeds of such sales in bank to the credit of the party of the second part, to apply on said note, retaining in the said store only sufficient of such proceeds to pay current bills and expenses of carrying on said business, and for making change.

"And it is further agreed that the parties of the first part will at least once a month, to wit, on or before the tenth day of each month, during the continuance of this mortgage, or the extension thereof, account to the party of the second part (L. H. Fenske) for all sales and collections made during the · previous month, and pay over to the party of the second part at such times of accounting the proceeds of all such sales and collections, to apply towards the payment of said promissory note, after deducting the actual and necessary expenses of carrying on said drug business, and the actual and necessary living expenses of the said A. E. Ross, one of the parties of the first part, and after deducting enough to pay bills falling due for goods purchased to replenish said stock under the permission hereinafter granted.

"And it is further agreed that the said parties of the first part may from time to time purchase new goods, wares and merchandise for cash, or its equivalent, to replenish and keep up said stock of goods now on hand, and all such goods, wares and merchandise so purchased shall be considered as covered by this mortgage from and after their arrival in the said city of Billings, before they are placed in the said store as well as after; and, whenever the word 'store' is used in this mortgage, it shall be construed and understood to mean the front or sales room and the rear room or ware room of said store, and also the basement situate under said store."

The defendants by answer admitted the facts pleaded in relation to the judgment obtained against the firm of Ross & Co., but denied that the stock of goods and fixtures were of the value of $7,000, or of any greater value than $4,000.

They admitted the execution of the chattel mortgage, but denied all allegations of fraud, and averred that the said chattel mortgage was executed and delivered and accepted in good faith, and to secure a *bona fide* indebtedness, as set forth in the mortgage and the answer.   They affirmatively alleged that on and before February 16, 1895, defendant A. A. Fenske was indebted to the defendant L. H. Fenske in the sum of $1,110 and interest, which sum had been advanced before that time by said L. H. Fenske to A. A. Fenske, and had been used by the latter in the purchase of an interest in the drug business of A. E. Ross & Co.   It was alleged that L. H. Fenske at the time of the execution and delivery of the mortgage was a stockholder in the Yellowstone National Bank of Billings, and that on said February 16, 1895, A. E. Ross and A. A. Fenske were indebted to said bank in the sum of $2,150, with interest, and said bank being desirous of having said indebtedness secured, and the said Ross and Fenske desiring to secure the payment thereof, it was agreed between said Ross and A. A. Fenske, the said bank, and the said L. H. Fenske that the said L. H. Fenske should become responsible to the Yellowstone National Bank for the payment of said indebtedness, and that the same should be secured by the firm of Ross & Co. by giving the chattel mortgage described in this suit to the said L. H. Fenske, and that the amount due the bank, together with certain other debts of said firm, might be included in the said mortgage, and a note made by the members of said firm to L. H. Fenske, including the money due the bank and the indebtedness of $1,110 to L. H. Fenske, and the further sum of $1,000 due by the said Ross and Fenske to H. T. Ramsey of Billings, for part of the purchase price of the drugs and the drug business; that it was agreed that, for the purpose of assisting the firm of Ross & Co. in the continuance of their business, the said L. H. Fenske should assume, and that he did assume, and did agree with Ross & Co. and the bank and the said Ramsey to pay, the aforesaid debts of Ross & Co. to the said respective parties; and that pursuant to said agreement, L. H. Fenske did from time to time make pay-

ments on the said debts of Ross & Co. to the bank, and paid all the money due to the bank, excepting the sum of $750, which remained unpaid at the time of the filing of the answer, and that L. H. Fenske had entirely discharged the debt due by the said firm to Ramsey. It was also alleged that when the mortgage was given there were some bills for goods that had been ordered by the firm of Ross & Co., amounting to about $298, which the said L. H. Fenske agreed to pay, and that said sum was included in, and was part of, the consideration of the $4,500 note described in the mortgage, and which said bills L. H. Fenske paid in full before the commencement of this suit. It was further alleged that the mortgage was made in good faith, and for the better security of the payment of the debts of said A. E. Ross and A. A. Fenske to the bank, and to indemnify the said L. H. Fenske against loss by reason of his having assumed and agreed to pay the various sums of money as heretofore described, and which he had paid in good faith, and for the further purpose of enabling the said Ross & Co. to continue their business. It was then set forth that Ross & Co. continued the drug business according to the terms of the mortgage until June 24, 1895, when the defendant L. H. Fenske, the mortgagee, feeling and deeming himself insecure, and that the possession of the property was essential to his security, took possession of the property described in the mortgage, under the terms thereof, and retained the said property in his hands, selling therefrom at private sale in the usual course of business, but in his name as mortgagee, until November 20, 1895, when, as mortgagee, after having given due notice pursuant to the provisions of the chattel mortgage, he sold the property remaining at public auction, and that he, the said L. H. Fenske, bought the same in for $1,600, that being the best and highest bid made; that the said sum of $1,600, together with $55, the sum bid for the book accounts, was the reasonable value of said property; that after he took possession under the mortgage, and after paying the actual expenses of conducting the business, all the receipts were applied towards the liquidation of the

debt secured by the mortgage; that after properly applying the receipts of all kinds to the payment of the mortgage debt, less the expenses of foreclosure, sale and retention, and after applying the proceeds of the sales turned over by Ross & Co. between the time of the giving of the mortgage and the time that the mortgagee took possession, there was a balance still due on the mortgage of $2,506, no part of which had been paid when the answer was filed; and that thereafter, on December 10, 1895, the said L. H. Fenske sold all the property that had been bought in by him for $1,600, which sum, he alleged, was the reasonable value thereof.

The questions of fact involved were tried by a jury, who returned a general verdict and special issues for the plaintiffs. The special issues submitted directly involved the question of the good faith of Ross & Co. at the time of the execution of the chattel mortgage. The jury found that they intended to hinder, delay and defraud their creditors. Thereafter the defendants moved to set aside the findings of the jury. The court sustained this motion, for the reason that the findings and the verdict were contrary to the law and the evidence, and found the issues generally in favor of the defendants and against the plaintiffs, and gave the defendants judgment for costs. From this judgment, plaintiffs appeal.

*Messrs. Cullen, Day & Cullen,* and *Mr. J. A. Savage,* for Appellants.

The mortgage was void as a matter of law for the reason that it provides for a sale by the mortgagors on credit. The mortgage is in fact an assignment for the benefit of some of the creditors of the assignors. It segregated for the purpose of paying this indebtedness all of the property of the debtors, not to hold as security, but to sell and out of the proceeds to pay the indebtedness. Its very terms preclude the idea of security, in this, that all the proceeds from day to day, after applying enough to cover expenses, were to be deposited in bank to the credit of the mortgagee. If the mortgage of a stock of goods which permits the mortgagor to continue pos-

session and sell in the ordinary course of trade is to be upheld at all, it is only on the theory that the mortgagor becomes the agent of the mortgagee for the purpose of selling and accounting for the proceeds of sale. (*Rocheleau* v. *Boyle*, 11 Mont. 457.) The court will look through forms and arrive at the substance of the transaction and if, from an examination thus made, it appears that the essential characteristics of an assignment are present it is immaterial what the parties may term the instrument. (*Marshall* v. *Livingston Nat. Bank*, 11 Mont. 351.) If then this instrument is to be governed by the rules relating to assignments for benefit of creditors, the court should have held it void because of the provisions relating to sales on credit. (*Rosenstein* v. *Coleman*, 18 Mont. 459.) In the case at bar the questions were submitted to the jury and by them answered affirmatively to the effect that there existed a fraudulent intent in the execution of the instrument in controversy. This finding should not be set aside by either the trial or the appellate court, if there is substantial evidence to support it. (*Merchants' Nat'l Bank* v. *Greenhood*, 16 Mont. 395.) The mortgagee took possession of the property of the mortgagors June 24th, 1895. The mortgage gave him no power of sale of it prior to the maturity of the indebtedness and, if it did, it did not authorize him to sell it other than at public auction. Yet we find him selling in the ordinary course of business, paying operating expenses, replenishing stock and treating the stock of goods and the store in all respects as if it were his own. These acts amount to a conversion and render him liable to these plaintiffs for the value of the property at the time he took it, viz: June 24th, 1895. (*Haesler* v. *Hosp.* (Wis.) 34 N. W. 145; *Lininger* v. *Heron* (Neb.) 36 *id.* 481; *Loeb* v. *Milner*, 32 *id.* 205; *Lomax* v. *Walk* (Ore.) 54 Pac. 199.)

*Mr. O. F. Goddard*, for Respondents.

**MR. JUSTICE HUNT,** after stating the case, delivered the opinion of the Court.

The contention of appellants is that the mortgage was void because it contained a provision for the use and benefit of the mortgagors, by providing that out of the proceeds of the sales of the property covered by the mortgage the mortgagors were permitted to retain the necessary living expenses of one of them, and because it was provided that the mortgagors might sell the mortgaged property at retail, in the usual and general way of business, for cash, or on not to exceed thirty days' credit to responsible parties. We glean from the record the following facts, which should be considered in the determination of the questions presented by the applicants:

1. A. E. Ross and A. A. Fenske formed their partnership to enter into the drug business in June, 1894. At the time they started they borrowed some money from the Yellowstone National Bank, and bought a stock of drugs from one H. T. Ramsey, paying him $1,500 in money, and giving him notes for the balance due him. They afterwards added to the stock of goods bought from Ramsey by purchases from wholesale drug houses. On February 16, 1895, an inventory was taken, and the chattel mortgage referred to in the statement of facts preceding this opinion was given to L. H. Fenske for the purpose of securing what they owed to Fenske, to the bank, to Ramsey and other parties. The firm ran the business until June 24, 1895, purchasing goods from time to time with money taken in by them in their store. The mortgagor Ross drew out from the proceeds of the sales of goods about $100 a month for his living expenses. A. A. Fenske, the other partner and mortgagor, took no part in the conduct of the business, which never seems to have been profitable, owing to heavy expenses. On June 24, 1895, the mortgagee took possession, which was voluntarily surrendered to him by the mortgagors. At the time the mortgagee took possession the mortgagors were being pressed for payment by certain of their creditors, but the evidence is that the mortgage was executed to secure the notes which were assumed by the mortgagee, L. H. Fenske. The mortgagee testified that he saw that the business was not paying anything, and he asked the

mortgagors for a chattel mortgage, and took the mortgage to indemnify himself for moneys which he agreed to pay to the bank, and which were due by the firm, and for money due to Ramsey, and for the sum of $1,100 due by one of the partners to Ramsey. He said that he understood that an attachment was about to be served upon the property of the mortgagors, and in pursuance of advice by counsel he immediately took possession under the terms of his mortgage, put one Hill in charge of the store and continued to run the business for a time. The expenses were so heavy, however, that he concluded to sell it all off. While he was running the business he sold in the usual course of trade, and finally closed the whole stock out at auction on November 24, 1895, and bought it in himself for $1,600. This sale was at public auction, and numerous persons were present, including a representative of these plaintiffs. Some sales on credit had been made while the mortgagors were in charge, and before the mortgagee took possession, but about 90 per cent. of the sums charged had been collected before this suit was commenced. At the time of the execution of the mortgage in February, 1895, an inventory was taken and the goods and fixtures valued at $6,620.92, the stock itself being put at a little over $5,000. From the time of the execution of the mortgage, in February, and up to the time of taking possession by the mortgagee, in June, 1895, the firm's receipts were $3,054.9υ. Of this sum $1,144.05 was deposited in bank. The firm also purchased $1,635.33 worth of merchandise during that time. The total credit sales for that time were $860.05. The mortgagor Ross drew out $385.35. The expenses (rent, clerk hire, etc.) amounted to $1,525.50. When the mortgagee took possession another inventory was taken, whereat the stock was valued at $3,872.52 and the fixtures at $900. From the time of the execution of the mortgage until the mortgagee took possession, monthly reports of the business were made to the mortgagee, and the $1,144.05 deposited in the bank by the firm was put to the credit of L. H. Fenske, the mortgagee, under the terms of the mortgage, and from such deposits

there were paid considerable sums due for goods, by checks drawn by the mortgagee. When the inventory was made at the time the mortgagee took possession, it was computed upon the basis that if a man could be found who desired to go into the drug business in Billings, and invest in a drug store, and keep up the business, and was willing to pay for the good will and other appurtenances of such a business, the prices were fair and reasonable. The values were with relation to the wholesale price list plus the freight. It appears by a statement in the record that the mortgagee, from the time he took possession of the property, deposited in bank the sum of $1,518.55; and a recapitulation showing cash receipts since the execution of the mortgage disclosed that $7,125.01 had been received in that time, out of which there had been paid for merchandise and expenses the sum of $6,353.75, which with the sum of $27.78, representing a loan and cash balance in bank, left a balance of $743.48 to be applied to the mortgage debt. We notice that included in the expenses from the time the mortgagee took possession, in June, to November, 1895, he paid to Ross, the mortgagor, the sum of $515.35 for living expenses. The management of the store was in Mr. Hill, who had been a clerk in the employ of the mortgagors, Ross & Co. The purchaser, after the auction sale, testified that at the time he purchased the goods he thought they were worth about 50 cents on the dollar of the invoice, and that he believed he paid a fair market price for them in November, when he bought.

We believe that, upon consideration of all this evidence, the court was justified in finding no actual and intentional fraud on the part of the mortgagors and the mortgagee. The fact that a relationship existed between one of the mortgagors and the mortgagee cannot invalidate the mortgage. If the debt was one honestly due, the mortgagors had a right to secure it, whether due to a relation or any one else, even though their action left nothing for their other creditors, provided, always, the transaction was in good faith, and entered into with honest intention. As evidence of fraud, and of an

intent to hinder and delay creditors, plaintiffs also mention the fact that part of the amount included in the partners' note to Fenske was an individual indebtedness of $1,100 due by one of the partners. This statement is correct, as the testimony shows that $1,100 was loaned by the mortgagee to one of the mortgagors, who used the money borrowed to buy an interest in the new drug firm of Ross & Co. at the time that the partnership between Ross and Fenske was formed. But the mortgagee took the note of the co-partners and the mortgage by the firm in good faith and for value. When the partners executed the mortgage, they had full possession of the property,—no lien had attached to it, and, both partners consenting, their right to mortgage the stock in good faith can not be denied. The principle that the assets of a partnership are for distribution to their creditors does not obtain, without regard to rights already existing. Again, the right to have partnership property first applied to partnership debts is one primarily for the benefit of the partners, and, if they waive such right, firm creditors cannot invoke it to secure preferences over mortgage creditors. These rules rest upon the principle that the right of creditors of a partnership to have partnership debts paid out of partnership property before the debts of an individual partner is not a lien or trust, but is a derivative equity from the partner, and can be made effective only through the equity of an individual partner, to which the creditor is subrogated. It follows that, if such partner is in no position to enforce it, a firm creditor cannot. "So, if, before the interposition of the court is asked, the property has ceased to belong to the partnership,—if by a *bona fide* transfer it has become the several property either of one partner or of a third person,—the equities of the partners are extinguished, and consequently the derivative equities of the creditors are at an end. It is therefore always essential to any preferential right of the creditors that there shall be property owned by the partnership when the claim for preference is sought to be enforced." *Case* v. *Beauregard*, 99 U. S. 119, 25 L. Ed. 370. (See, also, *Reynolds* v. *Johnson*, 54 Ark.

449, 16 S. W. 124; *Purple* v. *Farrington,* 119 Ind. 164, 21
N. E. 543, 4 L. R. A. 535; *Smith* v. *Smith,* 87 Iowa 93, 54
N. W. 73; *In re Estate of Edwards & Wigginton,* 122 Mo.
426, 25 S. W. 904, 29 L. R. A. 681.)

2. The additional fact that the mortgagor was allowed to draw
$100 per month from the date of the mortgage until the sale
of the property by the mortgagee at auction is not of itself,
or in connection with the other facts in evidence, conclusive
of fraud.   If the mortgagor was employed by the mortgagee
after the latter took possession, he was entitled to compensa-
tion; if he was not, but was allowed to receive money, it was
evidence tending to establish a fraudulent intent on the part
of the parties to the mortgage.   But, as the district court has
found the issues generally in favor of defendants, and there
is evidence sufficient to justify the action of the court, we can-
not now set aside the conclusions of the district court, as un-
warranted by the evidence.   The finding by the judge that
the whole transaction was entered into in good faith, and for
the purpose of securing defendant L. H. Fenske and certain
creditors whose debts were evidenced by the note for $4,500
made by the mortgagors at the time of the execution of the
mortgage, is supported (*Haggin* v. *Saile,* 23 Mont. 375, 59
Pac. 154); and we shall therefore pass to the question of
whether or not, as a matter of law, the mortgage was invalid,
and operated as a fraud against the creditors of the mort-
gagors.   To that we briefly address ourselves.

Involved in this inquiry is the assertion of appellants that
the instrument under consideration is, in effect, an assignment
for the benefit of the creditors of Ross & Co., and should be
so regarded.   The facts, however, will not bear out this state-
ment, for they go to prove that Ross & Co. intended to keep
up their business, if they could, and that they merely gave
the mortgage to secure. Fenske for a debt due to him, and to
indemnify him for coming to their relief when other creditors
were demanding immediate payment, and threatening to at-
tach their property.   As far as we can gather from the evi-
dence in support of the court's finding, they had no intent to

devest themselves of title and all control of their stock of goods by conveying the same to a trustee for the purpose of securing a distribution of its proceeds among a portion of their creditors, which would have made the instrument, in legal effect, an assignment for the benefit of their creditors, as was held in *Marshall* v. *Livingston Bank*, 11 Mont. 351, 28 Pac. 312. Here we find the mortgagors retained possession, and intended to only give a lien on their property, preserving their equities as mortgagors, while in that case the mortgagor intended to make an absolute appropriation of property to his creditors by authorizing immediate possession, passing both the legal and equitable title absolutely beyond his control to the mortgagee, which was to sell, collect the proceeds, pay expenses, pay certain notes, and then account for any balance to the debtor.

The fact that a mortgage upon all of a debtor's property operates to secure certain creditors does not of itself make the security an assignment, where the written contract and the acts thereunder show an intention to give a security only, although it becomes the duty of courts to examine into the circumstances of such transfers very carefully, lest a transaction be given an effect in express contradiction of the intention of the parties to it. Tested by these principles, we conclude that Ross & Co. mortgaged their stock to Fenske, and that the law of chattel mortgages and not that of assignments for the benefit of creditors must be applied to the contract in question.

3. A mortgage which authorizes the mortgagor to retain possession, with the right to sell a stock of goods mortgaged, in the ordinary and usual course of trade, if otherwise good, is on its face a valid instrument, provided it appears therein that such sales are to be for the benefit of the mortgagee, and he is to account to the mortgagee for the proceeds of the sales. To this extent the courts and text writers have advanced in later years. We must remember that, as a substitute for possession in the mortgagee, the mortgage must be filed in the office of the county clerk. Secrecy is thus obviated, and opportunity to perpetrate fraud is greatly lessened.

The records are public, and creditors are thereby constructively advised of the nature and provisions of the mortgage—they have a knowledge that the mortgagor has given a lien upon his stock of goods, and of the provisions of the contract granting the lien. It is the policy of the recording acts that has outweighed the policy of an older rule, under which, upon the theory of constructive fraud, mortgages with power to sell the mortgaged goods in the usual course of trade were so often held void.

Mortgages of stocks in trade, with right to sell, cannot be said by judges to be the result of fraudulent intentions on the part of the parties to them, unless such intentions existed in fact; on the contrary, as Justice Brewer said of such transactions in *Etheridge* v. *Sperry*, 139 U. S. 266, 11 Supreme Court 565, 35 L. Ed. 171, the supreme court could not "be blind to the fact that the tendency of this commercial age is towards increased facilities in the transfer of property, and to uphold such transfers so far as they are made in good faith." In our opinion, where the law requires the filing of a chattel mortgage with the county clerk, as it does in Montana, in cases where the mortgage provides that the property may remain in the possession of the mortgagor (Compiled Statutes 1887, Fifth Division, Sec. 1540; Civil Code, Sec. 3864), and where "any interest in personal property which is capable of being transferred may be mortgaged," which was the law generally before the Codes were adopted, as it is now (Civil Code, Sec. 3860), the records give the requisite information to persons dealing with mortgagors, and contracts by way of security upon a stock of goods, with power to sell, under an agreement to apply the avails of sales to the payment of the mortgage debt, should be upheld, as promoting, rather than retarding, business arrangements, for they are not only compatible with perfect honesty, but suffer many a business to be kept up which would otherwise fail, and afford many a debtor an opportunity to gain a solid foothold in a community where he might otherwise go to the wall. "It is to be observed," say the supreme court of Vermont in *Peabody* v.

*Landon*, 61 Vt. 318, 17 Atl. 781, "that the mortgagee in such a case places the avails of the sale wholly within the power of the mortgagor, and must trust him, to a greater or less extent, to pay them over on the debt secured.   Yet, with the general power of sale, the parties, when the mortgage is made honestly, intend the property conditionally conveyed as security for the payment of the debt; and use it for that purpose.   There is no question in regard to the validity of such mortgages between the parties.   It is contended that they should not be held fraudulent *per se* and void, because such mortgages furnish a convenient opportunity to cover the property away from the other creditors for the benefit of the mortgagor, when they may be honestly intended and used to secure the payment of the mortgagor's debt in the most economical, and in such an inexpensive manner as to save something for the other creditors, or at least for the mortgagor.   It seems to us that, so far as controlled by public policy, the question is for the legislature rather than for the court, and that the fundamental error of Mr. Pierce, and the authorities which hold such mortgages fraudulent *per se* and void, lies in assuming that the question is to be determined by the principles of the common law as propounded in Twyne's Case, rather than by a fair construction of the provisions of the statute, and of public policy as indicated by the provisions of the statute."

Jones on Chattel Mortgages, Section 381, regards such mortgages as valid, and rests his text upon the principle that the statutes authorizing chattel mortgages where the mortgagor retains possession would fail of their purpose in respect to an important class of property,—merchandise held in stock and for sale,—if the doctrine of constructive fraud must obtain, and render such instrument void on their face.   The authorities for the more modern rule impress us as sound in their reasoning, and we hold that the question of the good faith of a mortgage transaction like the one before us is, on principle, not to be decided as one entirely of law, but is largely one of fact, and must be ruled upon accordingly. (*Etheridge* v. *Sperry, supra.*)

*Leopold* v. *Silverman,* 7 Mont. 266, 16 Pac. 580, decided by the territorial Supreme Court, followed the supposed doctrine of *Robinson* v. *Elliott,* 22 Wall. 512, 22 L. Ed. 758; but since those two decisions the Supreme Court of the United States, in *People's Savings Bank* v. *Bates,* 120 U. S. 556, 7 Supreme Court 679, 30 L. Ed. 754, and *Etheridge* v. *Sperry,* already cited, has declined to accede to the doctrine of the case of *Robinson* v. *Elliott, supra,* as interpreted in *Leopold* v. *Silverman, supra,* while this Court has likewise modified, if it has not drawn away from, the views expressed in *Leopold* v. *Silverman,* by already putting itself in accord with the better rule.  (*Rocheleau* v. *Boyle,* 11 Mont. 451, 28 Pac. 872; *Heilbronner* v. *Lloyd,* 17 Mont. 299, 42 Pac. 853.)

4.    Nor is the mortgage on its face invalid because it authorized one of the mortgagors to retain his necessary living expenses; for if there be no fraud in law by necessary implication from the mortgage of the stock in trade with power to sell to pay the debt due the mortgagee, and account for the sales to him, or generally from a chattel mortgage of all the goods of a merchant, with such powers and agreements contained within it, it is difficult to see how an agreement which allows the mortgagor to draw out enough for his subsistence necessarily has the effect to hinder, delay or defraud creditors and is a fraud upon them.  It certainly is competent evidence to be considered in the determination of the question of the good faith of the parties to the mortgage, but if the whole transaction is honest, and has been entered into in good faith by all parties to the mortgage, the only way by which, in most instances, the provisions agreed upon can be effectually carried out, and by which the stock can be sold, and the mortgagee paid, and the mortgagor's business still allowed to continue, is to permit the mortgagor to manage the stock with regard to the rights of the mortgagee, and to draw a living from the proceeds while he is doing so.   Indeed, if he has no other property or independent means,—and a merchant who executes such a mortgage in good faith is usually wholly without ways of living, outside of the net proceeds of current

sales from his stock,—yet it is a fraud for him to draw out enough for him to live upon, such a mortgage is of no benefit to the mortgagor; for he simply cannot remain in possession to fulfill the agreement, if he can get nothing to live upon while performing the contract. Carried to its conclusion, it will readily be seen that, if such mortgages are to be held fraudulent on their faces because of such agreements, none may make them, except men of independent means or credit; but as we all know that such persons do not, as a rule, have to resort to these liens to protect their creditors, it is more just to establish principles which will give effect to such mortgages by consideration of that common knowledge which tells us that those who mortgage their stocks are too often without any other means at all, and yet by the law they have the power to mortgage whatever they have, in an honest effort to pay their debts without resort to assignment for the benefit of creditors. All such agreements, however, whether in parol or included in the mortgage itself, should be closely scrutinized, for they force the transaction involved close to the line where the law will say the parties have adopted a means whereby creditors are hindered and delayed; yet, notwithstanding all this, such mortgages are not necessarily of such a character that the law will conclusively imply fraud, if none actually exists, but will leave the question of good faith to be tried as one of fact. (*Frankhouser* v. *Ellett*, 22 Kan. 127.) In *Oliver* v. *Eaton*, 7 Mich. 107, a provision whereby the mortgagor was to apply the proceeds of sales in the purchase of other goods, keeping up the stock, "and in the support of his family," and to pay a certain indebtedness, was held by Campbell, J., not to render the mortgage null and void, but that the intent was for the jury. (See, also, *Gay* v. *Bidwell*, 7 Mich. 519, and *Sperry* v. *Etheridge*, 63 Iowa 543, 19 N. W. 657.)

In the very recent case of *Williams* v. *Mitchell*, (Kan. App.) 58 Pac. 1025, the case of *Frankhouser* v. *Ellett*, 22 Kan. 127, *supra*, and *Whitson* v. *Griffis*, 39 Kan. 211, 17 Pac. 801, are affirmed in the following language: "It is

further contended that the mortgage is void upon its face by reason of the following provision: 'It is agreed that said R. Allen Hall shall remain in possession of store, subject to the prior provisions of this mortgage, and, after expense of store and living are deducted, the balance of money shall apply on debts secured.' A chattel mortgage will not be declared void upon its face for the reason that the mortgagor retains possession of the stock, and is permitted to deduct his living expenses from the proceeds of the sales, 'but will be upheld or condemned according as the arrangement is entered into and carried out in good faith or not.'" We think, therefore, that on the face of the instrument this provision does not require the Court to treat it as fraudulent and void.

5. We disagree, too, with the contention that the authority "to sell at retail to regular and other customers in the usual and general way of business for cash, or on not to exceed thirty days' credit to responsible parties," *per se* renders the mortgage void. We would advise against a provision in a chattel mortgage allowing sales on credit, as its apparent tendency is to vest in the mortgagor a discretion in respect to his sales which may afford him an opportunity to collusively dispose of his stock with intent to delay and defraud unsecured creditors; but, while such a provision invites a challenge of the transaction involving it, on the other hand we are not prepared to say that a right to sell at retail only to customers in the usual and general way of business, for cash, or on credit of no more than 30 days, gives so great a latitude to the mortgagor that, as a matter of law, it destroys the security of the mortgage lien, and conclusively negatives all presumptions of good faith, and forbids any inferences other than those of a fraudulent intent. Having shown that mortgages upon stocks of goods, with power to sell therefrom in the usual course of business, are valid, it would seem to follow, where the mortgage may run for a year, that sales at retail (if the business is a retail one generally), for cash, or to *responsible* parties on a limited credit for 30 days, are not incompatible with the best of faith and perfect honesty, where

the mortgage provides for accurate accounts of all sales, and that collections and deposits be applied towards the payment of the debt, less necessary and actual current expenses of conducting and maintaining the business.    The usual and general way of conducting a drug business in a small town is probably to sell in part on a 30-day credit to responsible people, so that authority to extend such a credit may be but an agreement that sales can be made in the usual and general way of business.

Sales and application of proceeds of sales are strictly within the intended purposes of chattel mortgages of the kind before us, and, so long as the parties to them keep within the bounds of the lawful operations of such mortgages, they have a right to insert any reasonable provisions consistent with the intention of applying the stock mortgaged to the liquidation of the debt secured by it.    Now, under the stipulation of the mortgage by Ross & Co. to Fenske, the accounts of all sales were to be made monthly, and at the accounting the proceeds of all sales and collections, less expenses, etc., as hereinbefore considered, were to be applied to the payment of the note to Fenske.    This stipulation imputes no fraud to either party, for, so long as it was complied with, the mortgage was having its desired and lawful effect, and Noyes Bros. & Cutler were not injured; nor were they hurt by an extension of a credit for thirty days, because, as against them, or any unsecured creditor in like position, all sales, whether cash or for credits, were to be accounted for; and we are of opinion credit sales should, as between mortgagors and mortgagee, all be deemed cash payments paid over to apply on the note of Ross & Co., although, as between Ross & Co. and Fenske, the credit may not have been collected, and may in fact have been unpaid at the time of the accounting.    In *Brackett* v. *Harvey*, 91 N. Y. 214, an agreement was entered into between a mortgagor and mortgagee, wherein the mortgagee agreed, among other things to "take business notes running sixty and ninety days, to be indorsed by said Frank E. Darrow, and apply the same in pay-

ment of Darrow's said notes as they fall due." Thereafter a
mortgage was executed pursuant to said contract, and, upon
the question of the validity of the mortgage because of such
an agreement, the court held that, under a stipulation allow-
ing the mortgagor to sell the mortgaged property, but ac-
counting to the mortgagee for the proceeds, and applying
them to the mortgage debt, "the proceeds realized by the
agent are to be deemed realized by the principal, and, as
against an adverse lien, are to be applied on the mortgage
debt, even though not actually paid over," and that under
that doctrine it is impossible to impute fraud or injury to
others in the agreement. The reasoning of the New York
court appears to recognize an agency in the mortgagor who
sells goods, whereby his act in selling for credit binds the
mortgagee to treat the credit as if it were cash; and this way
of looking at it finds support in *Conkling* v. *Shelley*, 28 N. Y.
360, *Miller* v. *Pancoast*, 29 N. J. Law, 250, and *Frankhouser*
v. *Ellett*, *supra*, and other cases referred to hereafter. In
the last case Judge Brewer, for the court, said that a mort-
gagor in possession, with authority to sell and apply the pro-
ceeds, acts in respect to the sales "as a *quasi* agent, at least,
of the mortgagee." We do not regard him as an agent in
fact, inasmuch as the mortgagor is the owner of the stock
mortgaged at least until steps are taken to foreclose his rights,
yet he is an owner under an agreement to sell for the benefit
of the mortgagee, and to account, and to reserve nothing be-
yond what is actually necessary to be reserved to carry on the
business and live upon; and in carrying out this agreement,
so far as the rights of third persons who are creditors are
concerned, he occupies a relationship towards the mortgagee
which should be deemed to bind the mortgagee to the extent
of requiring that all credit sales made pursuant to the author-
ity of the mortgage should be treated as cash, and applied on
the debt secured by the mortgage. To this extent we concur
with Jones on Chattel Mortgages, Sec. 422, who says the
mortgagor in such cases "may well enough be regarded as the
agent of the mortgagee in making the sales and in receiving

the purchase price.'' In *People* v. *Bristol*, 35 Mich. 29, decided before the last Kansas case cited, the court decided that a chattel mortgagor is an owner, and could not be the agent of the mortgagee; but notwithstanding this reasoning, which we think is exact, in a sense, the case is cited to support the text of Mr. Jones, that the mortgagor may ''well enough be regarded as the agent;'' and, moreover, it was before the Supreme Court of Kansas, in *Frankhouser* v. *Ellett, supra,* where the mortgagor was characterized as a *quasi* agent, for Judge Brewer cited the opinion as an authority on another point, but referred to it as sustaining the doctrine of agency, as he applied it. It can be said, therefore, that, while the mortgagor is the owner, yet by virtue of the mortgage he has contracted in good faith to conduct his business and sell his stock to liquidate his mortgage debt; and in order to do this, and still avoid suspension, he has agreed to turn over all moneys to the mortgagee, only reserving necessary expenses, and that in executing this agreement he will act for the interests of the mortgagee, and, in a measure, in his direct behalf. A mortgagor intrusted with this authority must possess the confidence of the mortgagee, and it is because of this confidence that he is permitted to sell under agreement to turn over and account. His position is, therefore, in this sense, that of an agent of the mortgagee; while as to third persons, in respect to credits, he is to be held an agent. (*Gleason* v. *Wilson,* 48 Kan. 500, 29 Pac. .698; *Wilson* v. *Sullivan,* 58 N. H. 260; *Allen* v. *Goodnow,* 71 Me. 420; *Sawyer* v. *Long,* 86 Me. 541, 30 Atl. 111.)

*Lane* v. *Starr,* 1 S. D. 107, 45 N. W. 212, is an interesting case upon the point just considered. The sheriff there levied upon a stock of drugs and other goods under attachments and executions against one C. J. Lane, then personally in possession. Starr claimed ownership by virtue of a chattel mortgage executed by C. J. Lane to him, and brought action. The question considered was the validity of Starr's mortgage as against the creditors of Lane. The mortgage contained a clause authorizing C. J. Lane to remain in possession until

the mortgage debt was paid, "as agent of W. A. Lane," and required · him to account to W. A. Lane, or his assigns, monthly, for all sales, until the debt was fully paid.    There was a · further clause in the mortgage whereby the parties stated their intention to be that "the sale of the property should be absolute to W. A. Lane until the debt was fully paid, the said C. J. Lane acting only as the agent of said W. A. Lane in disposing of the goods,    *   *   *   and accounting   *   *   * until the indebtedness was paid."    The court held that the provision was a valid one, and that the means employed and consented to were consistent with the trust created to effect a direct and convenient conversion of the mortgaged property into money to be applied on the debt.    The court said this, also:    "In this treatment of this case we have not forgotten the theory of our statute, that the title to mortgaged property remains in the mortgagor, nor have we overlooked the apparent difficulty of making the mortgagor, who still owns the goods, the agent of the mortgagee, who does not own them; but this relation of the parties to the title to the property cannot affect the principle involved in this discussion, nor require nor justify the application of a different rule for the discovery of the true character or effect of the agreement. The quality of the transaction, as fraudulent or otherwise, is determined from its effect, possible or probable, upon the interests of other creditors; and the effect of this agreement upon those interests would be precisely the same whether the title passed to the mortgagee, or whether it remained in the mortgagor.    The presence or absence of vice in this agreement is tested by the inquiry whether the sales were to be made in the interest of the mortgagor, and the proceeds controlled· by him, so that they might or might not be applied upon the mortgage debt, or whether they were to be made in strict and faithful execution of a real trust, so that every decrease of the security should work a corresponding reduction of the debt."    (See, also, *Felner* v. *Wilson*, 55 Ark. 77, 17 S.·W. 587; *Crow* v. *Red River Co. Bank*, 52 Tex. 362; *Fink* v. *Ehrman Bros.*, 44 Ark. 310, and *Adler & Bros.* v. *Claflin, Mellin & Co.*, 17 Iowa, 89.)

6. Appellants next argue that the court's decision in favor of the respondents is erroneous, because the mortgagee, after he took possession, sold the mortgaged property in the ordinary course of business, and disposed of the same at auction, prior to the maturity of the debt, and without authority contained in the mortgage to make any sale at such time.    Let us grant that this is all true, and, even so, the plaintiffs are not in a position to complain.    The mortgage being a valid security, and possession thereunder having been legally taken, and plaintiffs, as we have shown, having had no lien upon the stock of goods, and the mortgagors having acquiesced in the acts of the mortgagee, as firm creditors plaintiffs have not shown that they were injured by any acts of the mortgagee done to make his lien effective.    The property turned out to be inadequate security for the debt due Fenske, but there having been no fraud or illegality in his acts by which plaintiffs were injured, and plaintiffs having shown no title or right of possession to the property, they are without cause of complaint against the defendants.

Finding no error in the record, the judgment must be affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY:    I concur.

MR. JUSTICE PIGOTT:    I am not entirely satisfied, upon the facts as they appear in this case, that the provision of the mortgage permitting the actual and necessary living expenses of one of the mortgagors to be paid out of the proceeds of the mortgaged personalty does not, of itself, invalidate the mortgage as to the plaintiffs; I am inclined to think, however, that the better reasoning supports the conclusion of the opinion, that such provision does not, *per se*, necessarily avoid the mortgage as to creditors, and I therefore concur. Upon the other points decided I concur also.