(December 1, 1914.)

L. H. CAUTHORN, Trustee of the Estate of A. C. DUNNING and GUY OLIN, Partners Doing Business Under the Firm Name and Style of "THE TOGGERY," in Bankruptcy, Appellant, v. BURLEY STATE BANK, a Corporation, Respondent.

[144 Pac. 1108.]

BANKRUPTCY—CHATTEL MORTGAGE—PREFERENCE—CAUSE OF ACTION—REASONABLE CAUSE TO BELIEVE TRANSFER WILL EFFECT PREFERENCE—PLEADING.

1. In an action by a trustee in bankruptcy to set aside a transfer, on the ground that it effects a preference, and also that it is voidable as a fraud upon other creditors, under subdivision "e" of sec. 67 of the present bankruptcy law; the question as to a preference is determined from the facts and circumstances, and unless these are such as to produce a reasonable cause of belief in the mind of the person receiving the transfer that its enforcement would effect a preference, the transaction must be held valid. On the question as to whether a certain transfer is void because it is a fraud upon other creditors, the question must be determined by the evidence in each case.

2. *Held*, a chattel mortgage on a stock of goods which provides that the mortgagors may retain possession of the goods, sell them in the usual course of business, and each week pay a certain per cent of the gross proceeds of sales on the mortgage debt, is not void *per se*, but the question of its validity must be determined by the good faith or lack of good faith of the parties to the transaction.

APPEAL from the District Court of the Fourth Judicial District for Cassia County. Hon. Edward A. Walters, Judge.

Action by a trustee in bankruptcy to have a certain chattel mortgage declared illegal and void, and to have the mortgaged property turned over to the bankrupt's estate.   Judgment for defendant.   Plaintiff appeals.   Judgment *affirmed.*

W. E. Abraham and James H. Wise, for Appellant.

"It does not now depend upon the purpose of intention of the debtor or creditor.   It is implied that the debtor intended the transfer to be a preference at the time it was made." (*In re Andrews,* 144 Fed. 922, 75 C. C. A. 562; *In re First National Bank,* 155 Fed. 100, 84 C. C. A. 16; *Kimmerle v. Farr,* 189 Fed. 295, 111 C. C. A. 27.)

"The trustee need not prove knowledge or belief, only reasonable cause to believe that a preference was intended." (*Lampkin v. People's National Bank,* 98 Mo. App. 239, 71 S. W. 715.)

"This phrase includes reasonable cause to believe that the debtor is insolvent, for this is one of the elements of preference." (*Thomas v. Adelman,* 136 Fed. 973; *In re Kullberg,* 176 Fed. 585.)

"A person is always presumed to intend what is the necessary consequence of his act." (*Western Tie & Timber Co. v. Brown,* 196 U. S. 502, 25 Sup. Ct. 39, 49 L. ed. 571; *English v. Ross,* 140 Fed. 630; *Wilson v. Nelson,* 183 U. S. 191, 22 Sup. Ct. 74, 46 L. ed. 147; *Forbes v. Howe,* 102 Mass. 427, 3 Am. Rep. 475.)

"Whatever fairly puts a party upon inquiry is sufficient notice where the means of knowledge are at hand, and if the party under such circumstances omits to inquire and proceeds to receive the transfer or conveyance, he does so at his peril, as he is chargeable of knowledge and of all the facts, which by a proper inquiry he might have ascertained." (*Crittendon v. Barton,* 59 App. Div. 555, 69 N. Y. Supp. 559, 5 Am. Bankr. Rep. 775; *Wager v. Hall,* 16 Wall. (U. S.) 584, 21 L. ed. 504; *Hackney v. Hargreaves Bros.,* 68 Neb. 624, 94 N. W. 822, 99 N. W. 675; *Andrews v. Kellogg,* 41 Colo. 35, 92 Pac. 222; *Walker v. Tenison Bros. Saddlery Co.* (Tex. Civ. App.), 94

S. W. 166; *Whitwell v. Wright,* 115 N. Y. Supp. 48; *Stevens v. Oscar Holway Co.,* 156 Fed. 90.)

"Where a mortgage is given to secure a present loan in a pre-existing debt, it is invalid as a preference and to the extent of the pre-existing debt secured thereby." (*City National Bank v. Bruce,* 109 Fed. 69, 48 C. C. A. 236; *Stedman v. Bank of Monroe,* 117 Fed. 237, 54 C. C. A. 269; *In re Hull,* 115 Fed. 858; *In re Wolf,* 98 Fed. 84; *In re T. Furse & Co.,* 127 Fed. 690, 62 C. C. A. 446.)

"Possession of a stock of merchandise by the mortgagor, with power to sell and retail the same, without requiring the proceeds to be applied to the payment of the debt due the mortgagee is void as to attaching creditors of the mortgagor." (*Lewiston National Bank v. Martin,* 2 Ida. 734, 23 Pac. 920; *Robinson v. Elliott,* 22 Wall. (U. S.) 513, 524, 22 L. ed. 758; *Lyon v. Council Bluffs Sav. Bank,* 29 Fed. 566, 578.)

"Knowledge on the part of the mortgagee that the mortgagor is disposing of his stock at retail in the usual course of business without devoting the proceeds to the payment of the debt is sufficient evidence of the mortgagee's consent to such sales to warrant a conclusion of fraudulent intent and avoid the mortgage." (*Hayes Woolen Co. v. Gallagher,* 58 Minn. 502, 60 N. W. 343; *Scott Hardware Co. v. Riddle,* 84 Mo. App. 275, 282; *Ryan v. Rogers,* 14 Ida. 309, 94 Pac. 427.)

T. Bailey Lee, for Respondent.

"If the trustee fail to prove any one of the elements necessary to constitute a preference, the transfer cannot be set aside." (*Utah Assn. of Credit Men v. Boyle Furniture Co.,* 39 Utah, 518, 117 Pac. 800; *Crook v. People's Nat. Bank,* 18 Am. Bankr. Rep. 684, note; *McNaboe v. Columbian Mfg. Co.,* 153 Fed. 967, 83 C. C. A. 81.)

"Mere knowledge that a debtor is behind in his payments is insufficient to put his creditors upon inquiry, and charge them with facts an inquiry might disclose. Nor will the mere fact of taking security for a loan do so." (Loveland on Bankruptcy, p. 1003, note 47 and citations; *Grant v. First National Bank,* 97 U. S. 81, 24 L. ed. 971.)

"Creditor is not bound to trace or investigate suspicious circumstances which come to his attention." (*Blankenbaker v. Charleston State Bank,* 111 Ill. App. 393.)  Doubt or suspicion is insufficient. (*Summerville v. Stockton Milling Co.,* 142 Cal. 529, 76 Pac. 243; *Stuckey v. Masonic Sav. Bank,* 108 U. S. 74, 27 L. ed. 640.)

"An adjudication of bankruptcy soon after the transfer is insufficient to show reasonable cause to believe insolvency." (Loveland on Bankruptcy, sec. 506, note 68, and citations.)

And the burden of proof to show this "reasonable cause to believe" lies upon the trustee. (*Kimmerle v. Farr,* 189 Fed. 295, 111 C. C. A. 27; *Arkansas Nat. Bank v. Sparks,* 83 Ark. 324, 103 S. W. 626.)

Even had the partners been insolvent, this respondent must, under the language of sec. 11 of the Amendatory Act of 1910, have had "reasonable cause to believe that the enforcement of such transfer would effect a preference." (Loveland on Bankruptcy, sec. 492 and citations.)

"If a mortgage executed at the time the loan is made creates a lien on specific chattels, no preference is created." (Loveland on Bankruptcy, sec. 519; *First Nat. Bank of Holdredge v. Johnson,* 68 Neb. 641, 94 N. W. 837, 4 Ann. Cas. 485.)

In order to invalidate a mortgage such as the one involved here, actual fraud must be proven. The old common-law rule holding such mortgages fraudulent *per se* has been abolished by American jurisdictions which have recognized the utter impossibility amid modern business conditions of carrying on business under its restriction. (*Etheridge v. Sperry,* 139 U. S. 266, 11 Sup. Ct. 565, 35 L. ed. 171; *Williams v. Mitchell,* 9 Kan. App. 627, 58 Pac. 1025; *Whitson v. Griffis,* 39 Kan. 211, 7 Am. St. 546, 17 Pac. 801.)

TRUITT, J.—This action was brought in the lower court by the appellant, L. H. Cauthorn, trustee in bankruptcy of the estate of A. C. Dunning and Guy Olin, bankrupts, against the Burley State Bank, a corporation engaged in the banking business at the town of Burley, Idaho, to have a certain chattel mortgage on a stock of merchandise and fixtures appertaining

thereto, also located at said town, declared illegal and void and that the property described in said mortgage be turned over to said trustee as a part of the estate of said bankrupts.

The complaint sets up two separate causes of action. In the first cause set up therein, it is alleged that said A. C. Dunning and Guy Olin were on the 16th day of October, 1911, engaged in business as copartners under the firm name and style of "The Toggery" at said town of Burley; that said firm was at said date insolvent and that it was indebted to the defendant bank in the sum of $1,700. It further alleges that at said date said firm and said A. C. Dunning and Guy Olin executed and delivered to the defendant a promissory note in said sum of $1,700; that to secure the same they also at said time executed a chattel mortgage upon their entire stock of merchandise and fixtures used in the business and for no other consideration whatever; that said $1,700 was at said time a pre-existing, unsecured indebtedness; and that the transfer of said property was made for the benefit of said defendant with the intent to give it a preference as a creditor, and with intent to hinder, delay and defraud the other creditors of said parties, thereby making it possible for said defendant to obtain a greater percentage of its said debt than any other creditor in the same class. The complaint further alleged that at the time said chattel mortgage was given and said property transferred to the defendant, it had reasonable cause to believe that said parties were insolvent, that a preference was intended, and the transfer of said property was received by defendant with the intent and purpose to hinder, delay and defraud the other creditors of said parties of the same class. It further alleges that the defendant at the time of this transaction was and for more than one year prior thereto had been the banker for said firm, and as such had full knowledge of its financial standing and condition, that its liabilities greatly exceeded its assets and resources of all kinds; that said firm and said A. C. Dunning and Guy Olin were insolvent and unable to pay all their creditors in full, that said mortgage was intended as a preference over other creditors of the same class; that the same was made, executed and delivered for the pur-

pose of hindering, delaying and defrauding the other creditors of said parties of a like class.

The complaint also alleges that on the 9th day of December, 1911, a petition in involuntary bankruptcy was filed against the partnership composed of said A. C. Dunning and Guy Olin by a large number of their creditors representing claims of about $5,000, and that thereafter on the 13th day of December, 1911, the property of said partnership was placed in the hands of L. V. Gallogly, as receiver; that on the 7th day of March, 1912, an adjudication was had in the matter of said petition in bankruptcy, and said A. C. Dunning and Guy Olin were duly declared bankrupts; that thereafter on the 24th day of April, 1912, said L. H. Cauthorn was appointed as trustee in bankruptcy of their estate; that he at said date duly qualified as such trustee and has been acting as such ever since. It was further alleged that a notice to said bank was given by said trustee, L. H. Cauthorn, of the first meeting of the creditors of such bankrupts; that said bank by its agent appeared at said meeting and was requested by said trustee to surrender said chattel mortgage and property therein described and to share with the other unsecured creditors in the distribution of the estate, but it then refused to do so and has ever since refused to surrender the mortgage or said property.

From the record here presented, there seems to have been some irregularity in the proceedings by which the adjudication in bankruptcy in this case was effected, in this, that though the petition was against the partnership doing business under the firm name and style of "The Toggery," the adjudication was against A. C. Dunning and Guy Olin as individuals. And yet the only property that was taken possession of by authority of said proceedings and adjudication was the property of said partnership. However, as no question regarding the matter is presented by this appeal, if there was any irregularity in the proceedings by which said A. C. Dunning and Guy Olin were declared bankrupts as individuals when the petition was against them as copartners, it could not be raised in this court for the first time.

In the second cause of action, plaintiff alleges the execution of said note and mortgage set out in its first cause of action, as above mentioned, and then alleges that said mortgage was and is illegal and void, for the reason that the bank permitted the mortgagors to retain possession of said merchandise, conduct a retail business from day to day, and sell goods from the stock of merchandise so mortgaged without requiring the receipts from the sales of the same to be applied to the extinguishment of said mortgage indebtedness, that no payments were made on said mortgage, and that the same was made, executed and delivered to the bank for the purpose and with the intent to hinder, delay and defraud the other creditors of said copartnership, and that the defendant had full knowledge of such intent on the part of the mortgagors, and was a party thereto. The answer joined issue upon the material allegations of the complaint, and the cause was tried before the court without a jury. Both parties by a stipulation in writing waived findings of fact and conclusions of law, and thereafter the court duly entered judgment against the plaintiff and awarded costs to the defendant. From this judgment this appeal is taken.

As there were no findings of fact by the trial court, it is necessary for this court to examine the evidence and determine for itself what facts are established thereby and from these facts conclude whether the principles of law upon which the judgment rests are sustained by the evidence. There were only two witnesses, S. G. Rich and L. B. Gallogly, who testified in regard to the controlling points in the case. The only other witness called was the county recorder, and he was called simply to identify some records required to be used in the case. Mr. Rich testified that he was cashier of the Burley State Bank and had dealings with A. C. Dunning and Guy Olin while they were engaged in business as copartners under the firm name of "The Toggery" at Burley. He testified that said note and mortgage for $1,700 given on the 16th of October, 1911, were executed and delivered to take up an unsecured note for $1,500 and some interest thereon that the firm owed to the bank. This $1,700 was deposited to the

credit of the firm and $1525.25 checked from its account at said date so that $174.75 of this $1,700 note and mortgage was a new debt, and as to that sum the mortgage in any event would be valid so far as the question of preference might affect it.   This witness further testified that during the month of October, 1911, he inquired into the condition of this firm and went over their books, but made no inventory of the goods and fixtures; that its account at the bank was overdrawn during the months of September and October, and this led him to inquire into the condition of the business.   He also stated that the firm during October and November of said year deposited to its credit at various times a total sum of $579.23, the last deposit being made November 18th, but this sum was all checked out so that on that date there was an overdraft of $8.79 on the account of said firm.   During this time $55 was credited on the $1,700 note.   The mortgage provided that the mortgagors should each week apply 50% of the gross proceeds of the sales of merchandise covered by said mortgage in payment of the $1,700 indebtedness, and this witness testified that he went to the store each week, asked for a statement of the receipts from sales of the week and for 50% of the money received; he further testified that he went each week and had an accounting but did not get any money for some weeks.   He explained this by saying that, ''I am not certain but there were some weeks when the amounts applied to new stock and exhausted their funds and they had nothing to pay.''   The witness was asked about the individual property of Guy Olin, and though he testified that he owned fifteen or twenty thousand dollars' worth of property, he admitted on cross-examination that, ''He had his title in such shape that it could not be used for security. . . . . He had not perfected title to his real estate.''

It would seem from this explanation in regard to this property owned by Guy Olin that he could not use it for securing his creditors or raising money to pay them, and if this is so, we do not see how they could reach it by any legal process. In *Louisiana Nat. Life Assur. Soc. v. Segen,* 28 Am. Bankr. Rep. 19, it is stated that: ''In order to determine the solvency

of a bankrupt, the assets ought to be such as a creditor could realize on if he obtained a judgment against him in the ordinary course of judicial procedure.'' It is admitted that Dunning had no property other than his interest in this store, except a diamond ring. The amount of indebtedness presented by the unsecured creditors to the trustee in bankruptcy was $4,954, the mortgage in controversy amounted to $1,700, and there was another mortgage against the firm for about $1,000, making a total indebtedness of about $7,600 at the date of the filing of the petition in bankruptcy. At the time of the execution of this mortgage, the said goods and fixtures were estimated to be of the value of $3,500 to $4,000, and though this did not include book accounts, as the items of indebtedness within a short time after the date of said mortgage amounted to $7,600 as above stated, we think the record shows that this copartnership was insolvent at the date on which this mortgage was executed and delivered to the bank. Moreover, while it is true that secured creditors are not bound by an adjudication in bankruptcy and may litigate the same issues in another proceeding, still the adjudication is as to them *prima facie* evidence of what is therein decreed, and the adjudication was made March 7, 1912, so that it is *prima facie* evidence in this case that these parties were insolvent at that date or a little over four and one-half months after the date of the mortgage. And this fact might be considered as of some weight in determining whether the copartnership was insolvent at the date of said transfer.

The other witness, L. B. Gallogly, in this case testified that some months prior to the date of this mortgage, he was employed as a salesman by ''The Toggery'' firm and was so employed at that time; that on the 13th day of December, 1911, he was appointed receiver of the business of said firm by the federal court and took charge of the property on said date. He further testified that on the date of said mortgage he would estimate the stock of goods and fixtures to be worth from $3,500 to $4,000, though he did not take an inventory thereof, but when he took charge of the property as receiver, he then made an inventory of the merchandise and fixtures,

and this showed the value to be about $3,000. He further testified that during the month of October, 1911, the firm appeared to be doing a "very prosperous business," and was making sales of about $50 or $60 a day.

The foregoing statement includes the material facts in this case, as stated by the witnesses and as shown by the record.

Based upon the facts as thus shown to exist, it now becomes necessary to apply the principles of law applicable to them in order to reach a correct decision of the case. The appellant only complains of two errors, (1) "That the evidence conclusively shows that said mortgage was given with the intent to prefer the defendant bank, mortgagee, over other creditors of the same class, and was given to secure an antecedent debt; and (2) that said mortgage was illegal and void, for the reason that the same permitted the mortgagors to remain in possession of the same in the regular course of business without accounting to the mortgagee for the proceeds of said daily sales, and that the mortgagee knew and had reason to believe that the mortgagors were at the time insolvent." The first alleged error raises the question of a preference as defined by the National Bankruptcy Law now in force. The Bankruptcy Act of 1898, in regard to preferences, made the result obtained by the creditor, and not the intent of the debtor, the essential fact; if a transfer to a creditor within four months of the bankruptcy was received which would give him an advantage over other creditors of the same class, it was a preference without regard to the intent or motive of either debtor or creditor. As a large part of the mercantile business of this country is done upon a credit system, this law in its result materially restricted trade, for it to a large extent eliminated credit, and the retail merchant was limited in his purchases to such amount of goods as he could pay for in cash. So much complaint was made against this law and its evil effects on business were so apparent that the amendatory act of 1903 was passed by Congress. Subdivision "b" of sec. 60 of said act was further amended by act of Congress, approved June 25, 1910, and this subdivision so far as it relates to this case is as follows:

"If a bankrupt shall have procured or suffered a judgment to be entered against him in favor of any person or have made a transfer of any of his property, and if, at the time of his transfer, or of the entry of the judgment or of the recording or registering of the transfer if by law recording or registering thereof is required, and being within four months before the filing of the petition in bankruptcy or after the filing thereof and before the adjudication, the bankrupt be insolvent and the judgment or transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

Under the Bankruptcy Act as amended in 1903, an essential element to a preference was that the creditor "had reasonable cause to believe that it was intended thereby to give a preference," and in a number of cases it was held that the debtor must also intend the transfer as a preference, because such intention might be presumed from the necessary result of the transaction, and much refinement of argument as to the meaning of the word "intended," as used in this section, was indulged in by the courts in construing it. Probably on this account the language of this section was changed by the amendment of 1910, as will be noticed in the foregoing quotation, so as to eliminate the question of intention as to either creditor or debtor. As the law now is, if the creditor had reasonable cause to *believe* the enforcement of the transfer would *effect* a preference, it shall be voidable by the trustee. And, as already stated, this makes the intent of the debtor immaterial and predicates this element of a preference upon the *belief* of the creditor. And this belief must be based upon reasonable cause. We apprehend that the courts will find about as much difficulty in defining a "reasonable cause" as they have had in construing the word "intended" in this section before the last amendment thereto. The controlling question presented by appellant's first assignment, then, is

whether he has, by the weight of the proof, established the fact that the bank had reasonable cause to believe that the enforcement of this transfer would effect a preference.

Collier on Bankruptcy, 10th ed., p. 790, gives the essential elements of a preference under the present law as follows:

"Since the amendatory act, a preference consists in a person, (1) while insolvent and (2) within four months of the bankruptcy, (3) procuring or suffering a judgment to be entered against himself or making a transfer of his property, (4) the effect of which will be to enable one creditor to obtain a greater percentage of his debt than any other creditor of the same class. Such a preference is voidable at the instance of the trustee, if (5) the person recovering it or to be benefited thereby has (6) reasonable cause to believe that the enforcement of the judgment or transfer will result in a preference. If the transfer was made or the judgment procured or suffered while the debtor was insolvent and the effect of such transfer or judgment was to enable one creditor to obtain a greater percentage of his debt than any other creditor of the same class, such transfer or judgment is a preference. The burden of proving the existence of the essential elements of a transfer is upon the trustee seeking to avoid it."

The first authority cited in the brief of appellant on the question of a preference is *Swarts v. Fourth National Bank,* 117 Fed. 1, 54 C. C. A. 387, and the quotation given therefrom as the test of a preference is as follows: "The test of a preference under the act is the payment out of the bankrupt's property of a greater percentage of the creditor's claim than other creditors of the same class." But it will be found upon examination of this case that it presents a different state of facts from the one at bar, and moreover it was determined in 1902, which brought it under the provisions of the law of 1898, and for that reason, even if the facts had been identical with the facts before us in this case, the rule as to the test of a preference is not the same under the present law as it was under the statute of 1898. Under that statute, if the transfer was made within four months before the bankruptcy, it was voidable by the trustee because of that fact without

regard to the intentions of the parties to the transaction. But, under the present law, even though the transfer is made within the four months preceding bankruptcy, it is not voidable, unless the person receiving it has reasonable cause to believe that the enforcement thereof would effect a preference.

There are a number of authorities also cited by appellant upon the question of the intentions of the parties to a transfer that might effect a preference under subdivision "b" of sec. 60 of the present law, but we do not deem it profitable to review these authorities at length because they are not in point upon the question of a preference under the present law.

The vital question upon the point under consideration is whether the officers of the bank had reasonable cause to believe at the time of its execution that the enforcement of the $1700 mortgage given by said firm to it would effect a preference, and this must be ascertained from the facts connected with the transaction. This mortgage was executed by "The Toggery" and by Guy Olin and A. C. Dunning as individuals, upon the entire stock of goods and the fixtures of the store known as "The Toggery." The firm had been in business in the town of Burley for some considerable time and did its banking with the respondent bank. Prior to the date of the mortgage in controversy, the cashier of the bank investigated the business of the firm and concluded it was solvent, and the witness Gallogly testified that when he was employed there as a salesman it was making sales of from $50 to $60 per day prior to and about the time of the execution of said mortgage, and that the business seemed to him to be in a prosperous condition. If the facts and circumstances were such as to constitute in the mind of the officers of the bank a reasonable cause to believe when this transfer was given to it that the enforcement thereof would effect a preference, then it is voidable, but if from said investigation of the assets and the business of "The Toggery" made by the cashier of the bank, and with his knowledge of its financial affairs, a man of ordinary prudence and business experience would not have had a reasonable cause therefrom to believe that the enforcement of said mortgage would effect a prefer-

ence, then we think the contention of the appellant on this point must fail.   The fact that this firm was unable to meet all its obligations as they fell due alone was not sufficient to cause a belief that it was insolvent.

In *Wilson v. City Bank,* 17 Wall. (U. S.) 473, 486, 21 L. ed. 723, it is said: "Many find themselves with ample means, good credit, large business, technically insolvent; that is, unable to meet their current obligations as fast as they mature. But by forbearance of creditors, by meeting only such debts as are pressed, and even by the submission of some of their property to be seized on execution, they are finally able to pay all, and to save their commercial character and much of their property.   If creditors are not satisfied with this, and the parties have committed an act of bankruptcy, any creditor can institute proceedings in a bankrupt court.   But until this is done, their honest struggle to meet their debts and to avoid the breaking up of all their business is not, of itself, to be construed into an act of bankruptcy, or a fraud upon the act."   And in *Grant v. First National Bank,* 97 U. S. 81, 24 L. ed. 971, as a proposition of importance in discussing the question, it is said: "The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding."

But there is some testimony in the record in this case that we think has an important bearing on this question.   The cashier of the bank testified that Guy Olin was worth between fifteen and twenty thousand dollars at the time this mortgage was executed, and although it further appeared that his title to this property was not in such condition that he could mortgage it, still the rule given by Loveland for determining insolvency includes all of the assets of the creditor of every kind. "In computing the assets of the debtor to determine the solvency or insolvency, all his property which has value should be included.   In determining the question of the solvency, there should be included property exempt under the state law,

and property transferred in payment of or as security for a just debt, irrespective of whether it constitutes a preference or not." However, whether this property which this witness testifies to as being of the value of from fifteen to twenty thousand dollars should have been considered in determining the question of the solvency of this firm or not, the knowledge that it was owned by one of the partners would very probably have great weight upon the mind of a person in forming an opinion upon the financial conditions of the firm. After carefully considering the evidence and the circumstances in this case, we conclude that a reasonable cause to believe that the enforcement of this transfer would effect a preference in favor of appellant cannot be attributed to the respondent.

The second alleged error complained of by the appellant is that said mortgage was illegal and void, for the reason that the same permitted the mortgagors to remain in possession of the mortgaged goods and sell and dispose of the same in the regular course of business, without accounting to the mortgagee for the proceeds of the sales, and that the mortgagee had reason to believe that the mortgagors were at the time insolvent. But before taking up the argument of this question, perhaps it is well to pass upon the error alleged by the respondent in regard to the ruling of the trial court in not sustaining his motion to strike out the amendment made to the original complaint by adding thereto an additional cause of action. The trustee brought the action to have the said mortgage declared void, and in addition to the allegations in the first cause of action to the effect that it was void under subd. "b" of sec. 60 of the bankruptcy law, he had the right in the second cause of action to also demand that it be declared void under subd. "e" of sec. 67 of said law. We think the trial court did not err in overruling said motion.

The appellant cites a number of authorities to sustain his contention that this mortgage is void, for the reason that the mortgagors remained in possession of the goods and continued in possession of the property and to sell the goods upon which it was given in the regular course of business, with the knowledge and consent of the bank, without applying the proceeds

of the sales to the reduction of the mortgaged debt.    But there was a provision in the mortgage that was intended to meet this objection.    This provision is as follows:

"And it is hereby further mutually agreed by and between the respective parties hereto, that the mortgagors may continue to conduct a retail mercantile business heretofore and now being conducted by said mortgagors, in the said building aforesaid, and to sell and dispose of any portion or part of said stock for cash, in the conduct of said business, and to replace and replenish said stock by purchases from time to time, investing a portion of the proceeds of said sales in the purchase of goods for the replenishing and maintaining of said stock; provided, however, that 50% of the gross proceeds of said sales shall be applied upon and in discharge of said mortgage indebtedness, as evidenced by said note; to which end and for which purpose it is further mutually agreed that 50% of said sales shall be paid to the said mortgagee once each and every week until the said mortgage indebtedness together with the interest thereon shall have been paid off and discharged."

It would serve no useful purpose for us to review the earlier authorities that follow the common-law rule, holding that to allow the mortgagors to remain in possession of a stock of merchandise and sell it out in the usual course of business renders the mortgage void *per se,* for the reason that since the decision in *Etheridge v. Sperry,* 139 U. S. 266, 11 Sup. Ct. 565, 35 L. ed. 171, that rule has been greatly modified or abolished by a well-considered line of authorities.    The cases of *Robinson v. Elliott,* 22 Wall. (U. S.) 513, 22 L. ed. 758, and *Means v. Dowd,* 128 U. S. 273, 9 Sup. Ct. 65, 32 L. ed. 429, were frequently cited in support of the common-law rule, but in *Etheridge v. Sperry, supra,* these cases were analyzed and held not to control in that case.    In the opinion Mr. Justice Brewer says: "In neither of those cases is it affirmed that a chattel mortgage on a stock of goods is necessarily invalidated by the fact that either in the mortgage, or by parol agreement between the parties, the mortgagor is to retain possession, with the right to sell the goods at retail.    On the

contrary, it is clearly recognized in them that such an instrument is valid, notwithstanding these stipulations, if it appears that the sales were to be for the benefit of the mortgagee. What was meant was that such an instrument should not be used to enable the mortgagor to continue in business as theretofore, with full control of the property and business, and appropriating to himself the benefits thereof, and all the while holding the instrument as a shield against the attacks of unsecured creditors.''

The appellant cites *Ryan v. Rogers,* 14 Ida. 309, 94 Pac. 427, in support of his contention. But in this class of cases good faith is the controlling principle in testing the validity of the conveyance. And this must be in each case decided upon the evidence. The facts in the case at bar are very different from the facts in the Ryan case. In that case the mortgage was executed July 21, 1903, and no attempt on the part of the mortgagee to take possession thereof was made until July 8, 1904, and during all that time there was only $37.50 paid upon said mortgage. However, in that case the mortgage was not held void *per se,* but the court after reviewing the facts presented by the record said: ''The fact that the mortgagee permitted the mortgagor to remain in possession of the property, which was within itself something like double the value of the debt secured, for a period of one year, and for at least nine months after breach of the conditions named in the mortgage, and sell and dispose of the property, without any attempt to collect any part of the mortgage debt, or take possession of the property, would, as a matter of law, be such a fraud upon attaching creditors and purchasers as to avoid the mortgage.'' In the case at bar, it appears from the evidence that the mortgage was executed on the 16th day of October, 1911, and that on the 9th day of December, 1911, bankruptcy proceedings were instituted against said firm and the possession of the property placed in the hands of a receiver under such proceedings. The cashier of the bank testified that he went to the business place of the mortgagors each week and required them to make an accounting and pay the amount of the proceeds of their sales, as provided in said

mortgage, and although the payments amounted to only $55 during said time, there were some weeks when the amounts of their sales had been applied to new stock, and in that way their funds were exhausted and they had nothing to pay. But his testimony also is to the effect that they were making sales and paying their current bills and expenses and conducting the business in the usual way until the bankruptcy proceedings were commenced, and we think these facts clearly distinguish this case from *Ryan v. Rogers, supra.*

After a careful consideration of the facts and circumstances in this case, we are disposed to think that the respondent was acting in good faith, that its cashier did not believe and did not have reasonable cause to believe that the firm was insolvent at the time of the execution of this mortgage or during the time thereafter until said proceedings in bankruptcy were commenced. We think the evidence shows that he hoped by giving the mortgagors reasonable indulgence in the matter of this indebtedness to the bank, it would pull through its financial stress and in the course of time be able to meet all its indebtedness. The trial court heard the testimony, weighed the evidence, and found in favor of the respondent, and we do not find from the record, as presented, that the judgment of that court should be disturbed. The judgment is therefore affirmed and costs awarded to the respondent.

Sullivan, C. J., concurs.