Eulah Evelyn Stalnaker $v$. The Lincoln National
Life Insurance Company

(No. 7992)

Submitted November 21, 1934.   Decided December
18, 1934.

*E. E. Robertson* and *Lillian S. Robertson,* for plaintiff
in error.

*Mohler & Peters* and *H. L. Snyder, Jr.,* for defendant
in error.

KENNA, JUDGE:

Eulah Evelyn Stalnaker brought notice of motion in the court of common pleas of Kanawha County against the Lincoln National Life Insurance Company of Fort Wayne, Indiana, on a life insurance policy issued jointly to her and her husband, William C. Stalnaker, in the amount of $5,000.00 and providing that the survivor should be the beneficiary of the first to die. William C. Stalnaker died August 13, 1932. The issues were made up by appropriate pleas and specifications of defense to raise the questions hereinafter discussed, and after trial to a jury and verdict for the plaintiff in the sum of $4,-008.10, representing the face of the policy after the indebtedness forming a lien against it in the amount of $991.10 had been deducted, the trial court, on motion, set aside the verdict as being contrary to the law and the evidence. From this action of the trial court, the plaintiff below prosecutes this writ of error.

The policy of insurance in question was issued December 21, 1920, and at the death of William Carl Stalnaker had been carried for something less than twelve years, the annual premium being $161.60. The policy was carried on an annual premium basis until December, 1929, when an irregular premium was accepted by the company carrying the policy to February 21, 1930. The insured then elected to pay the premiums on a quarterly basis, and such payments were received or credited by the company until July 2, 1931, when a quarterly premium was credited. On October 5, 1931, the current premium not having been paid, the cash surrender value of the policy was entirely absorbed by the loans against it for actual money borrowed by the insured, and by premiums for extended insurance advanced by the company under the automatic premium-loan feature of the policy. In this state of the policy, by its terms it was forfeitable upon thirty days' notice to the insured telling them that at the end of the thirty days, the liability of the company under the policy would terminate by reason of the exhaustion of all value and the failure to pay premiums.

The policy expressly provides that during the extended insurance, the insured may at any time resume the payment of premiums. Through inadvertence occurring in the home office of the company, however, this situation was not discovered on October 4, 1931, and the notice of expiration was not mailed to the insured until May 15, 1932. On that day, there was mailed to the insured from the home office of the company a notice telling them that on June 15, 1932, by reason of the fact that the indebtedness against the policy equaled its cash surrender value, all of their rights under the policy would terminate unless premium payments were resumed in the interim. This notice contained no statement of the amount necessary to carry the policy further. However, at about the same time, the home office notified the local agent of the company of the situation, and instructed him to collect the sum of $91.16 from the insured prior to June 15, 1932, in order to prevent a forfeiture of the policy. A regulation of the company introduced in evidence is to the effect that its agents are not to receive any less than the sum named in instructions issued under these circumstances. These instructions were communicated to the insured, and the sum of $91.16 to carry the policy to February 21, 1933, was demanded by the local agent. There is testimony indicating that the insured protested against the demand for $91.16, and stated their willingness to pay the quarterly premium amounting to $42.88, in order to keep the policy alive. The suggestion of the payment of the quarterly premium by the insured is denied by the cashier of the local office to whom the offer is testified to have been made.

The testimony of the cashier in the local office is that he could not have, under the circumstances, accepted the quarterly premium but was required to collect the sum of $91.16. Letters were sent by the local office under date of May 19th, and June 10th, calling attention to the fact that the policy would be lapsed on June 15th, unless the sum of $91.16 was paid. On June 22nd, a letter was addressed to the Stalnakers notifying them that the policy had lapsed and enclosing reinstatement forms. On

June 29th, reinstatement forms were signed by both the Stalnakers and were sent to the local agent along with a check of $91.16 signed by Celia E. Hutton, Mrs. Stalnaker's sister, who had loaned them the money. The testimony is to the effect that this check was actually drawn on June 27th and Mrs. Stalnaker testifies that she did not know that the check was connected with the reinstatement forms which were signed, but supposed that it was a payment, during the grace period, of the demand of the company to keep the policy in effect upon payment of that sum. On June 30, 1932, a receipt from the branch office was issued for the check for $91.16. July 27, 1932, the cashier of the local office wrote to William C. Stalnaker informing him that his application for reinstatement had been rejected by the company, but that Mrs. Stalnaker's had been accepted, and offering to retain the policy in effect as to Mrs. Stalnaker on the basis of an annual premium of $99.45, and telling him that, together with the then loan value of the policy, the money in suspense in the company's hands was sufficient to carry the policy on Mrs. Stalnaker to December 21, 1932. The letter requested that the company be informed as to the course the insured desired to take. A check was introduced in evidence drawn by defendant company to the order of William C. Stalnaker for $91.16 as a refund of the amount paid by the Stalnakers on their application for reinstatement of the policy. Mrs. Stalnaker denied that the name "William C. Stalnaker" as indorsed upon this check, was in her husband's writing.

The testimony altogether fails to make clear the exact reason for demanding of the Stalnakers the payment of the sum of $91.16 to constitute the resumption of payment of premiums. Isaac McNeel, the cashier of the local branch office of the company, testified that he did not figure what the amount of $91.16 represented, but that his understanding was that it represented the balance of a current premium on an annual basis. He testified that after the home office had instructed him to collect $91.16, he would not have been allowed to receive payment of premiums on a quarterly basis. Mar-

tin D. Johnson, the chief accountant for the company, to whose attention the error of the company had been drawn about the first of July, 1932, after the notices demanding the payment of $91.16 had been sent to the insured, testified concerning it, in part, as follows:

"Q   When you wrote Mr. McNeel and asked him to collect $91.16, did you tell him when that would pay the policy premium to?   A   The regular form telling him the minimum to collect was $91.16, provided the regular form showing the last charge shows the minimum to collect $91.16, and that minimum is aways for the balance of the current policy year.
Q   Then that $91.16 would not have carried it anywhere?   That was simply back payments? Is that it?   A   That is correct.
Q   And had they paid that, their policy would still have lapsed?   Is that true?   A   That is right.
Q   You figured that it took $91.16 to pay what they owed you from October 5th 1931 to June 15th 1932?   A   It wouldn't have taken exactly $91.16; taken a little less than that.
Q   But that was what this was for?   That was to pay up what was back?   A   No, that notice was not mailed with that intent, no.
Q   What was this $91.16 for?   A   This was for the balance of the then current policy year, the way the records then stood.
Q   That would have carried the policy to what date?   A   February 21st 1933.
Q   Then you did not request of these people to make any payment of what you now claim is back at all, did you?   A   No, because they let the policy lapse; they never made the demand for that coverage of free insurance.
Q   And you were willing to accept $91.16 and carry it on to February 21st 1933?   Is that right?   A   I won't say that we would have accepted that, no."

The mistake made by the company in failing to notify the insured October 5, 1931, that the policy would lapse within thirty days because of the exhaustion of the cash

surrender value and because of the non-payment of premiums, was never taken up in any way with the insured nor explained to them.

In this state of the record, the plaintiff in error contends, first, that a forfeiture of the policy cannot be based upon the failure of the insured to meet the demand of the company for the payment of $91.16, for the reason that that sum of money did not, under any circumstances, represent a correct calculation of premiums, and was far in excess of the quarterly premium that the insured had elected to pay and which constituted the maximum that the company could expect to receive in the form of a resumed payment of premiums. Second, even if the $91.16 be admitted to be a justified demand from the company, that the insured paid into the branch office on or about June 29, 1932, the sum of $91.16, and that the company had received payment of the amount demanded within the thirty days of grace after the lapsing of the policy, no matter if that sum is to be regarded as having been paid in connection with their application to reinstate the policy as lapsed. The defendant, on the other hand, contends that the action of the trial court in setting aside the verdict against it was justified because, first, the policy in fact had lapsed on October 5, 1931, for the non-payment of premiums and the total absorption of its cash surrender value, and that thereafter all liability of the company was completely and absolutely terminated on the 15th of June, 1932, upon the maturity of the thirty days' notice given, there being no grace accorded upon demand for this sort of payment. And, second, that after the notice which matured on June 15th, the termination of the policy was complete, and that this fact was confirmed and agreed to by Stalnaker upon the filing of his application to reinstate the policy, and the acceptance back by him of the company's check for $91.16 deposited with that application.

In our opinion, in this state of the record, the first question to be considered is whether the company was justified in its demand for the payment of the sum of $91.16 as a resumption of premium payments under the

policy. By the express provisions of the policy contract, the insured had the right at that time to resume the payment of premiums. The instructions of the home office of the company, as well as the testimony of its cashier in its West Virginia branch office, prove that the company would not have accepted at that time less than the amount that it demanded. Therefore, if the company was demanding more of the insured than it was justified in asking as a resumption of premium payments, its demand was excessive and the policy cannot be lapsed nor forfeited on account of the failure of the insured to meet it. *Covenant Mut. Life Assn. v. Kentner*, 188 Ill. 431, 58 N. E. 966; *Knott v. Security Mut. Life Ins. Co.*, 161 Mo. App. 579, 144 S. W. 178; *Benjamin v. Mutual, etc., Assn.*, 146 Cal. 34, 79 P. 517.

Under the policy contract, it is optional with the insured to pay premiums on an annual basis or, on an anniversary date of the policy, to elect to pay on a semiannual or quarterly basis. In this case, the insured had exercised their right and had changed from an annual to a quarterly basis of paying premiums. This change had been ratified by the company by the acceptance of a number of quarterly payments. After the change, the premiums actually paid by the insured were all on a quarterly basis. The company contends that it had the right, without request from the insured, to put the policy back on an annual premium basis because, in crediting a premium under the automatic premium loan provision of the policy, it was cheaper to credit it on an annual basis than to credit it on a quarterly basis. It would justify its conduct in going back to an annual basis by saying that it did so for the benefit of the insured. We do not believe that the company is the judge of this question. The insured here now complain that its conduct was a prejudice instead of a benefit. The company, in effect, represented to the insured that the provisions of the policy would be operative until June 15, 1932. The insured had the right to resume premium payments at any time before that date. The resumption of payment of premiums naturally means payment in the manner that the insured

was at the time accustomed to making. These were quarterly payments, it appearing from the ledger sheet introduced by the witness Johnson that both the premiums paid in cash, and the credits of premiums made by the company under the automatic premium loan provision, were last put through the books of the company on a quarterly basis. It would therefore appear that the company did not make an attempt to revert to an annual basis of premium payment until the question of the lapsing of the policy arose. We are of opinion that at this time the payment of the current quarterly premium of $42.88 to keep the policy in effect would have been the correct demand for the company to make. Instead, it demanded more than twice that sum. The policy clearly contemplates that the insured shall have, before the policy is declared forfeited or lapsed, information concerning the correct status of the policy and full opportunity to resume the payment of premiums upon a correct basis. This, we do not believe, the insured in this case received. Not having received it, we are of opinion that no forfeiture nor lapse of the policy could be declared by the company on account of the failure of the insured, misinformed as they were as to the circumstances and the amount to be paid, to resume the payment of premiums.

But the company asserts that when the insured both signed applications for reinstatement and paid in the amount demanded, that they agreed to and acquiesced in the forfeiture and lapsing of the policy upon which those applications were based. We do not believe that this result follows. Obviously, the applications for reinstatement were based upon a belief on the part of the insured that the policy had lapsed and been forfeited. As a matter of fact, it had not been. The applications for reinstatement and the money paid thereunder evidence a determination on the part of the insured to retain the benefit of the policy even in view of the too great demand made by the company. If the company, in the circumstances, cannot take advantage of the lapsing of the policy due to its erroneous demand upon the insured, then it certainly can gain no benefit from the applications for reinstatement, which were brought about by the erron-

eous belief that the policy had lapsed. *Aiken* v. *Atlantic Life Ins. Co.*, 173 N. C. 400, 92 S. E. 184; *Mutual, etc., Assn.* v. *Hamlin*, 139 U. S. 266, 11 Sup. Ct. 614, 35 L. Ed. 167; *Lovell* v. *St. Louis Mut. Life Ins. Co.*, 111 U. S. 264, 28 Law Ed. 423. Under what we believe to be the law applicable to the state of the facts shown by this record, the actual payment by the insured of the $91.16 becomes immaterial, because the demand for that amount on the part of the company as a resumption of premium payments was not justified.

On the basis of what has been said, we believe that the trial court erred in setting aside the verdict in favor of the plaintiff, and its action in that respect will, therefore, be reversed, the verdict reinstated and judgment entered here on the verdict of the jury.

*Reversed and rendered.*